# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## CENTRAL DIVISION

BILL WICKERSHAM and )
MAUREEN DOYLE, )
     )
       Plaintiffs, )
     )
      v. )      Case No. 05-4061-CV-C-NKL
     )
CITY OF COLUMBIA, MISSOURI )
and )
MEMORIAL DAY WEEKEND )
SALUTE TO VETERANS CORP., )
     )
       Defendants. )

## ORDER

## I.    Summary

Plaintiffs Bill Wickersham ("Wickersham") and Maureen Doyle ("Doyle") seek a preliminary injunction so that they can distribute leaflets and circulate petitions at a Memorial Day Air Show which is to be held at the City of Columbia's airport. Because it is likely that Doyle and Wickersham will be partially successful on the merits and will be irreparably harmed if an injunction does not issue, the Court will grant some but not all of the relief sought by the Plaintiffs.

The Memorial Day Air Show ("Air Show") is to be held on May 29 and 30, 2005, at the Columbia Regional Airport ("Airport"), which is owned by the City of Columbia ("City"). The Air Show consists of an aerial display viewed by the public from a designated part of the Airport tarmac. In addition to the aerial display, various booths and stationary

1

displays are authorized to occupy the designated tarmac. The Defendant, Memorial Day Weekend Salute to Veterans Corporation ("Corporation"), does not permit any unauthorized displays or booths, but the Air Show is open to the public because the federal government will not permit the use of its planes unless the public can attend.

Although the entire event is open to the public, including the designated tarmac where the public comes to watch the show, the Defendants claim that the Corporation has the authority to exclude anyone from the public crowd who does not meet its approval. To support this proposition, Defendants point to a contract between the City and the Corporation which gives the Corporation exclusive control over the designated tarmac, subject only to the City's right to retake possession of the tarmac in the event of an undefined emergency. This contract was executed despite a City Ordinance which specifically provides that the City cannot cede control of any part of the Airport to a third party.[1]

The City and the Corporation contend that, regardless of the ordinance, the City has no power to require the Corporation to permit any free speech at the Air Show because to do so would interfere with or dilute the Corporation's message. According to the Corporation, the message of the Air Show is to honor and remember veterans, and if any group or individual engages in any expression unapproved by the Corporation, it would violate the Corporation's right to free speech because the Corporation does not want to be

---

[1] After learning of this Ordinance in the Plaintiff's opening brief, the City introduced an ordinance to change its law on this subject.

2

associated with anyone else's message.

The problem with the Defendants' argument is that the City is inextricably involved in the Memorial Day Air Show and, therefore, neither the Corporation nor the City has a right to control all expression at this public event. The City runs the Airport during the Air Show and provides other necessary support such as special police, fire and sanitation resources. While the Corporation plans the order of the aerial demonstrations, the plan must be approved by the City's Airport personnel. While the Corporation contracts with the federal government and other pilots to bring their planes to the City and pays for some to come,[2] it simply cannot make the planes fly without the contemporaneous operation of the Airport by City personnel. Furthermore, the federal government will not even send its planes unless the City attests that the City is making the Airport available for the Air Show and it is officially supported by local government.

This is not like turning over a city park to a private organization and letting them put on an event to honor and remember veterans, or to individuals for a family reunion, or even having an arts festival on all the city's streets. Under those circumstances, the private group merely has the use of public property and, therefore, could exclude whoever they wanted even though the event is occurring on public land and open to the public.[3] In contrast, once the city becomes a substantial, necessary and active participant in the event,

_____

[2]The publicly owned planes are provided without charge. However, the Corporation must pay the travel expenses of the personnel who handle the planes.

[3] This assumes that a city issues permits without regard to the viewpoint of the group seeking to use the public land.

3

it cannot rely on superficial distinctions created by contract to insulate itself from constitutional obligations. While the Corporation has 3,000 volunteers and spends about $100,000 each year for the event, it is undisputable that the Air Show could not occur without the substantial involvement of the City before, during and after the event.

Because of the symbiotic relationship between the City and the Corporation, the Constitution does not permit them to exclude all unapproved expression. On the other hand, the Constitution does permit reasonable time, place and manner restrictions. Most of the Air Show is devoted to entertainment, but there are events during that Air Show which specifically recognize the sacrifices made by the current and former men and women in the armed services. During such solemn events, the Defendants can exclude leafleting, protests, petitioning, or any other speech or activity that might distract the crowd or offend those whose loved ones are being recognized.[4] But the Defendants may not simply say that the entire Air Show is to honor and remember veterans and, therefore, any message other than ones approved by the Corporation will distract, mar or offend.

Because the Court finds the Air Show to be a nonpublic forum, it is permissible for the Defendants to exclude all petitioning. The Supreme Court has permitted such restrictions in the terminal of an airport which also contained substantial other commercial activity and this is closely analogous to the event at hand. The Defendants cannot, however, exclude all leafleting. The Supreme Court and other courts have recognized in similar

---

[4]    These restrictions must be content neutral and uniformly enforced.

circumstances that leafleting cannot be prohibited. Nor can the Defendants ban all protests because such a rule is patently overbroad and vague. For example, the Defendants cannot exclude clothing which expresses a viewpoint with which the Corporation disagrees.

While all First Amendment activities at the Air Show are subject to reasonable time, place and manner limitations, any rules adopted by either Defendant must be content neutral and must be uniformly enforced. For example, the Defendants cannot let in a sign which says "God Bless our Troops" and exclude a sign which says "God is Watching," which was done in the past.

Defendants do retain control over who will be permitted to fly in the Air Show and who may sell goods or have a booth at the event. The Defendants, and in particular the Corporation, have an interest in controlling who is perceived to be associated with them. A reasonable person would not think that someone handing out leaflets in a crowd represents the viewpoint of the organizers of an event absent some identifying mark. However, they could reasonably associate the Corporation with the booths and displays at the event. Just because the Corporation has entwined itself with the City, that does not mean that the Corporation's interests are to be ignored. All three parties in this dispute are entitled to have their respective interests protected in such a way as to not interfere with the objective interests of the others.

## II. Facts

### A. Corporation's Background

Prior to the Corporation's formation and the inception of the Air Show, the City did

not have many activities to celebrate Memorial Day. When Mary McCleary Posner ("Posner"), the president of the Corporation, first moved back to Columbia in the 1980s, the Memorial Day festivities consisted of "[f]ive men gather[ing] at the Court House for five minutes of speeches. If it rain[ed], they [held] it in the garage of the funeral home." Def. Ex. 110. To correct the situation, Posner worked with five veterans from the Korean War and they decided to have a parade and, eventually, they came up with the idea of an Air Show.

The Corporation was officially organized in 1991 as a private not-for-profit corporation. Pl. Ex. 1. Its mission statement is: "To Honor and Remember those who served, those currently serving in our Armed Forces, Guard, Reserves, and our Allies." Def. Ex. 110. In her deposition, Posner stated that the purpose of the Corporation was not to glorify war. Posner Dep. at 49:18-22.

The Corporation sponsors two major events during the Memorial Day weekend: (1) a parade through downtown Columbia on Memorial Day, and (2) a two-day Air Show that is held at the Columbia Regional Airport. Def. Ex. 121, 127.

**B.** **Air Show**

The Corporation's Air Show is defined as "the aerobatic and static display of aircraft and related exhibits, a static antique automobile show together with the sale of food for consumption on the Airport grounds and entertainment events and related activities." Pl. Ex. 5. The Air Show usually draws approximately 30,000 people. Pl. Ex. 6 and 7.

The Air Show is held on a secured tarmac of the Airport, which is owned by the City

6

of Columbia.  Boston Dep. at 6:22-24.[5]  The City provides use of the Airport to the

Corporation free of charge.  Posner Dep. at 249:19 to 250:3.  The Airport is located

outside the Columbia city limits in an unincorporated area of Boone County, but is owned

by the City.  Boston Dep. at 6:25 to 7:10.  The Air Show is open to the public and is free of

charge.  Def. Ex. 122.  The federal government, which has provided planes and personnel

for the Air Show, requires that the event be open to the public; otherwise, it will not

participate.  Pl. Ex. 6 and 7.

On the map of the Airport contained in Plaintiffs' Exhibit 22, the area outlined with

the words "Crowd Area Static Displays" is the tarmac that the public is allowed to enter

during the Air Show.  Pl. Ex. 22.   The tarmac is enclosed with a fence and there are three

gates onto the tarmac from the parking area that help control ingress and egress of the

crowds.  Posner Dep. at 127:1-4.  All three gates are open to the public during the Air

Show.  Pl. Ex. 26 (public map identifying three gates as Entrances to the Air Show).  The

tarmac is not open to the public except during the Corporation's Air Show.  Boston Dep. at

112:1-20.  When the tarmac is not being used for the Air Show, airplanes park there and

cargo and commercial flights arrive there.  Boston Dep. at 112:1-10.

During each of the two days of the Air Show, the Corporation sponsors a ceremony

during the middle of the day.  Annette Sanders ("Sanders"), the former volunteer media

chair for the Air Show, testified at the hearing that during the ceremony, they play the

_____

[5]Mr. William Boston is the manager of the Airport.  Boston Dep. at 6:10-11.

national anthem, lower the flag to half staff, read the names of the 225 Boone County veterans who have died during combat, and then play Taps. During the hearing, the Corporation's counsel stated that they used to read the names at the Boone County Courthouse ceremony at the conclusion of the parade, but they moved it to the Air Show because there is a larger crowd at the Air Show.

To book the aircraft for the Air Show, the Corporation often has to pay the owners of private aircraft an appearance fee and reimburse the aircraft owners for their fuel and other expenses, including lodging, meals, and transportation costs. It also gets planes and equipment from the federal government, but pays only for the travel expenses of the government employees. In addition to aerial support from the federal government, the Corporation receives support from the Boone County Fire Department and the University of Missouri-Columbia ambulance services for emergency services. Boston Dep. 33:19 to 34:1. The University of Missouri-Columbia, the Missouri Highway Patrol, and the Boone County Sheriff's Department also provide law enforcement personnel to work security at the Air Show at no expense to the Corporation. City Police Captain, Michael Martin ("Martin") Dep. at 74:10-25; 76:5-20. The Corporation estimates that it spends $100,000 per year to sponsor the Air Show. The Corporation has 3,000 volunteers and 65 committee chairpersons, including a board of directors who work on the Air Show and its other activities.

### 1. *Air Show Rules*

The Corporation has adopted a number of rules concerning the Air Show. Some of

8

those are found on the Corporation's website and include:

- -- No coolers, picnic baskets, no alcohol, no pets
- -- No bikes, tricycles, scooters or roller blades
- -- No smoking inside the gates
- -- No unauthorized sales
- -- No petitioning
- -- No soliciting
- -- No political campaigns

Def. Ex. 122. The Corporation also communicates these spectator restrictions in its press releases and fact sheets. Def. Ex. 144 and 148. In 2003, the Corporation's restrictions expanded to prohibit umbrellas, glass containers, and signs. Pl. Ex. 4.

The Corporation fleshes out its prohibitions in its Security Detail which is given to the City Police who provide security at the Air Show. Specifically, the instructions state: "No protests are permitted inside the tarmac fence. No signing of petitions for any reason, and no passing of handbills for any reason is permitted inside the tarmac. Authorized programs, and authorized handout materials on the part of exhibitors is permitted." Pl. Ex. 29.

In preparation for the 2003 Air Show, the Columbia Police Department created an intra-office security memorandum that anticipated how it would respond to protesters at the Air Show. The memorandum stated:

> [Protesters] are not allowed to enter onto the tarmac area and are restricted to protesting outside of the Columbia Bust Gate, noted as Gate #1 . . . . Should protestors attempt to enter the premises, officers will immediately advise the Command Center and will stop their forward progress . . . . Any person who persists in entering will be given a trespass warning prior to arrest. Keep in mind that persons are not restricted from entering, only those who intend to conduct a protest once entry is made. . . . Once given a trespass

9

warning, any person who attempts to enter onto the airport property is subject to arrest.  The Tarmac Supervisor and Law Enforcement Security Commander should be notified.  A representative of [the Corporation] will be asked to respond.  Should the person continue to refuse to obey directions the representative from [the Corporation] may request that person be arrested for trespassing and will sign the summons issued to the arrested person.

Pl. Ex. 43.  *Also see* Pl. Ex. 29 for the Columbia Police Department's security form which is used to implement this policy.

The Corporation, by its president, Mary Posner, is the ultimate arbiter of what speech is allowed to occur on the tarmac and she alone decides whether particular conduct violates the restrictions outlined above.  Martin Dep. 51:21 to 52:1; Pl. Ex. 43 (instructing officers to contact the Corporation representative in the event of protesters).  Martin testified that, "if [Posner] says that she does not want somebody on her property, regardless of what her reasoning is, I would ask that person to leave," even if the reason was the person's race or viewpoint.[6]  Martin Dep. 67:24 to 65:2.

In her deposition, Posner testified that the Corporation's restrictions on leafleting and handbills would prevent disruptions at the Air Show, debris on the tarmac, and increase the enjoyment of the public.  Posner Dep. 235:22 to 236:7.  Posner also expressed concern that distributing information on the tarmac would cause the size of the crowd to increase;  Posner Dep. 238:17-21, and "[i]t just is not an acceptable way for us to be able to honor and remember."  Posner Dep. 238:25 to 239:1.

_____

[6] Race and speech-related exchange between Plaintiffs' counsel and Martin.  *See* Martin Dep. 68:11 to 69:1-6.

10

Although the Corporation restricts protest activities on the tarmac, it does not restrict activities outside the fenced area. In his deposition, Martin, who was responsible for coordinating security at the Air Show, testified that it was alright for individuals to protest or distribute leaflets or handbills anywhere outside the fenced tarmac area. Martin Dep. 117:13-21.

### 2. Speech Restrictions at Prior Air Shows

At the 1999 Air Show, Plaintiff Doyle carried a sign around the tarmac that stated, "God Bless our Troops." Doyle Dep. at 8:5-11. Doyle estimated that the sign was approximately two by three feet in size. Doyle did not hand out leaflets during her 1999 visit to the Air Show. Doyle Dep. 8:25 to 9:2. Doyle estimated that she walked around the tarmac with the sign in front of her for approximately ninety minutes. At the same Air Show, Steve Jacobs was refused entry onto the tarmac because he was carrying a sign that said, "God is watching." Wickersham Dep. at 68:2-16. Wickersham testified that a City police officer tore up the sign and refused entry for Steve Jacobs. Wickersham Dep. at 68:2-16.

Doyle attended the Air Show on Saturday, May 29, 2004, and tried to distribute fliers with the following quotes:

Thoughts On War and Peace

"We have grasped the mystery of the atom and rejected the Sermon on the Mount. Ours is a world of nuclear giants and ethical infants. We know more about war than we know about peace, more about killing that [sic] we know about living." -- General Omar Bradley

11

> "Why is it so easy for us to be willing to pick up arms and risk our lives, and so difficult to put down those same weapons and still risk our lives - in the cause of life?"  -- Rams Kysia, a young Muslim-American peace activist

Pl. Ex. 33.  After she had distributed some leaflets, a City police officer approached Doyle and told her she could not distribute them.  Doyle Dep. 23:2-4.  During this interaction, the officer advised Doyle that he would arrest her if she continued to hand out leaflets.  Doyle Dep. 23:5 to 26:13.  The officer who approached Doyle was riding a bicycle and he was wearing a yellow t-shirt, navy blue shorts, and a bike helmet.  Doyle Dep. 22:13-19.  The officer was also wearing an identification badge that had the words "Columbia Police Department" on it.  Doyle Dep. 27:4-11.

Approximately seven additional officers subsequently arrived on the scene and they were dressed the same as the original officer who approached Doyle.  Doyle Dep. 26:14-17, 26:22-23.  One of the newly-arrived officers grabbed some of Doyle's fliers out of her hands, and Doyle subsequently left the Air Show.  Doyle Dep. 29:7-25.

At the 2004 Air Show, Wickersham also attempted to collect signatures for a petition for renewable energy.  Wickersham Dep. at 14:11 to 15:6; Pl. Ex. 31.  Wickersham would ask individuals if they wanted to sign the petition; if they refused, then he did not ask them again.  Wickersham Dep. At 16:24 to 17:4.

Wickersham was standing approximately thirty to forty yards inside the tarmac when a City police officer approached him and told him he could not circulate his petition.  Wickersham Dep. 30:10-15.  The officer handcuffed Wickersham and took him to the police department's command post at the Air Show.  Wickersham Dep. 32:5-16.  The

12

officers at the command post confiscated Wickersham's clipboard and issued him a citation for trespassing. Pl. Ex. 32 and 32A. Martin consulted with Posner regarding Wickersham and Posner instructed Martin and the officers to arrest Wickersham for trespassing. Martin Dep. at 54:5-10. Neither the police report nor Martin's testimony at his deposition reflect that Wickersham was being disruptive. Pl. Ex. 32A; Martin Dep. at 64:3-7. To date, the City has not prosecuted the trespassing citation against Wickersham, but the matter is still pending. Wickersham Dep. at 34:15-18.

### a. Future Speech

Doyle testified that she intends to distribute leaflets again at the 2005 Air Show. Doyle Dep. at 33:5-13. Wickersham is not sure whether he will attend the 2005 Air Show or attempt to engage in free speech activities at the 2005 Air Show.

### b. Speech At the Air Show By Parties Other than Plaintiffs

In her deposition, Posner testified that at one of the Air Shows in the late 1990s, Posner observed a group of protesters on the tarmac who were holding a banner that Posner believed was anti-military, although she cannot remember the details of the banner. Posner Dep. 209:18 to 212:10. Posner testified that there were six individuals carrying the banner and that they were blocking the entrance onto the tarmac. Posner Dep. 209:18 to 212:10.

In another incident in the late 1990s, Posner testified that there were six people on the tarmac circulating a petition against cockfighting and another issue, although Posner did not know what the other issue was. Posner Dep. 212:15 to 217:22. Posner stated that some patrons of the Air Show complained to her that the circulators were harassing them

13

and their families by repeatedly asking them to sign the petition and sticking clipboards in their faces. Posner Dep. 212:15 to 217:22.

Posner also testified that one individual who was distributing leaflets threw the leaflets in the air and left them as trash on the tarmac when the individual was asked to leave the Air Show. Posner Dep. 221:15 to 222:6.

### c.    Safety

In his deposition, Martin could not identify any security risk that may be attendant to allowing peaceful speech activity on the tarmac. Although leaflets distributed by protesters may increase debris on the tarmac, and thereby increase the risk of harm to the aircraft, Martin acknowledged that those risks are already present because there are authorized handouts and trash on the tarmac. Martin Dep. at 70:14-19.

Martin stated his only concern with free speech activity on the tarmac was the possibility of disruption or volatility due to unwanted petitioning. Martin Dep. at 44:14-19. In 2004, Martin stated that petitioning-related complaints were "minimal" and that he was aware of only the two speech-related incidents in 2004 which involved Wickersham and Doyle. Martin Dep. at 48:7 to 49:2. Boston has not witnessed any disruptions with speech-related activity on the tarmac, although he indirectly heard about the problems with petitions. Boston Dep. at 76:2 to 77:1.

### 3.    *Other Activities at the Air Show*

### a.    Vendors

In addition to the aerial and static displays of the aircraft, other activities take place

14

on the tarmac.  Numerous vendors sell food, beverages, ice cream, and souvenirs on the

tarmac.  Pl. Ex. 26.  Posner testified that there were four food and beverage tents, two ice

cream vendors, and three souvenir tents, all of which are on the tarmac.  Posner Dep. at

99:13-20.  Civic organizations, like the Columbia Downtown Optimist Club, staff some of

these vendor booths and they split the profits with the Corporation.[7]  Posner Dep. at 97:19

to 98:4.  In 2004, the University of Missouri Bookstore was allowed to sell approved

books on the tarmac and conduct a book signing.  Posner Dep. at 96:22 to 97:12.  Boy

Scouts also offer souvenir programs on the tarmac during the Air Show in return for a five

dollar donation.  Posner Dep. at 103:6-10.

### b.        Recruiters

Armed forces recruiters staff booths on the tarmac and provide handouts to patrons

of the Air Show.  Specifically, recruiters from the Army, Navy, Navy Reserve, Marine

Corps, Air Force, Air Force Reserve, Coast Guard, and Missouri National Guard are all on

the tarmac during the Air Show at booths for their respective branch of the armed forces.

Pl. Ex. 26.

In addition to their recruiting booths, the recruiters from the armed forces also set

up exhibits for patrons of the Air Show.  Those exhibits include: an Army climbing wall,

NASCAR, adventure van, and shooting gallery; a Navy Taj Mahal; Air Force Raptor and van;

---

[7]Posner testified that the civic organization staffing the booth gets ten percent of the gross sales while the Corporation gets thirty percent of the gross sales, with the remaining sixty percent going to the producer of the good being sold.  Posner Dep. 98:3-9.

15

Marine Corps obstacle course; and multiple National Guard vehicles and pieces of equipment. Pl. Ex. 6. Plaintiffs contend that the recruiters circulated in the crowd and handed out materials, but the Court does not find sufficient support in the record for that contention.[8]

**c.     Rejected Activities**

Although the Corporation allows vendors and armed forces recruiters onto the tarmac, it does limit the presence of other organizations. For example, in March 1998, The American Legion inquired about staffing an information booth inside the tarmac during the Air Show. Def. Ex. 182. The American Legion was concerned that its organization did not have enough visibility during the Air Show. Def. Ex. 182. The Corporation rejected The American Legion's request and wrote: "We do not allow any booths, tables or handouts at our events. . . . I think that you will understand that we are bombarded with requests to use the Memorial Day Weekend Salute to Veterans Celebration for other purposes than to 'Honor and Remember' and we say 'no' to all of them." Def. Ex. 119. However, the Corporation did encourage The American Legion to staff one of the vendor booths available on the tarmac and suggested: "The civic groups are encouraged to hang their banners on the tent." Def. Ex. 119.

In her deposition, Posner testified that the Corporation receives approximately 50

---

[8]Plaintiffs cited to Martin's deposition testimony in support of their contention. However, Martin testified that he could not say whether the recruiters were distributing materials or carrying clipboards. Martin Dep. 92:11 to 93:5.

to 150 requests every year from groups seeking display space on the tarmac during the Air Show. Posner Dep. at 268:17 to 269:21. Groups include the American Red Cross, a company from New York that wants to solicit bank cards from patrons of the Air Show, and the Columbia Fire Department. Posner Dep. at 268:17 to 269:21, 274:7-17.

### 4.    The Corporation's Advertising

The Corporation produces glossy posters to hang around the City in anticipation of the Air Show. Posner Dep. at 266:15 to 267:10; Def. Ex. 120.[9] The caption at the top of the poster states, "Memorial Day Weekend Corporation Air Show." Def. Ex. 120. The poster does not have the word "veteran" on it anywhere nor does it reflect that it is an event in honor of veterans. Def. Ex. 120. The Corporation distributes approximately 2,000 of these posters around the City. Posner Dep. at 266:15 to 267:10.

The Corporation also develops a 30-second public service announcement for the local television stations around the City. Posner Dep. at 267:5-13. The Court does not have the content of this public service announcement.

In addition to the foregoing, the Corporation produces a souvenir booklet that it provides to Air Show attendees in return for a donation. Def. Ex. 112-114. Although the brochures do not promote the Air Show in advance, they are used as promotional tools for both the Corporation and the Air Show. The cover of the 2002 booklet contains the Corporation's full name and the phrase "A Salute To Those Who Serve, Save and Protect

_____

[9]Defendants' Exhibit 120 is actually a replica of the larger posters. It is a scaled down model. Posner Dep. at 266:17-22.

Us." Def. Ex. 112. Inside the booklet, there is information concerning the Corporation's year-round efforts for the Air Show, logistical information (i.e., parking, vendor map, etc.) for the Air Show, and advertisements for businesses in the City area. Def. Ex. 112. Some of the businesses choose to honor and salute veterans in their advertisements. For example, the McDonald's advertisement stated, "We Salute You! Thank you for your dedication." Def. Ex. 112 at p. 40. Another advertisement was purchased by Little Dixie Construction, L.L.C., and the advertisement stated, "A proud salute to America's Armed Forces." Def. Ex. 112 at p. 41. Both the McDonald's and Little Dixie advertisements also include their company logos and, in the instance of Little Dixie, contact information for the company.

While some advertisers in the brochure honor veterans with the text of their advertisement, many do not. For example, the inside back cover of the brochure was purchased by Columbia Ready Mix and it makes no mention of veterans. Def. Ex. 112. Similarly, the advertisements for Hertz and the University of Missouri Hospital make no mention of veterans or the Corporation's goal of honoring and remembering veterans. Def. Ex. 112 at pp. 42 (Hertz) and 24 (University of Missouri full page ad). Thus, the Corporation does not require that its advertisers incorporate its mission of saluting and honoring veterans and, instead, allows advertisers to control the content of their advertisements.

### C.   Role of the City in the Air Show

The City of Columbia devotes substantial public resources to the Air Show.

18

## 1.    *Resolutions and Agreements*

The Airport is owned by the City.  In 2000, 2001, 2002, 2003, and 2005, the
Columbia City Council adopted resolutions authorizing Columbia's City Manager to
"execute an agreement with [the Corporation] for an Air Show to be held at Columbia
Regional Airport."  Pl. Ex. 5A-5E.  The resolutions authorized the City Manager "to provide
support services for the Memorial Day activities planned by [the Corporation] within the
constraints of the city budget and taking into consideration the limited resources and
operational duties of the various city departments."  Pl. Ex. 5A-5E.

Pursuant to these resolutions, Raymond Beck ("Beck"), Columbia's City Manager,
entered into agreements with the Corporation.  Under the agreements, the City granted the
Corporation "exclusive control, subject to the rights of tenants and the provisions of [the
agreement], to control activities taking place on the [tarmac] during the time period of the
event."  Pl. Ex. 5A-5E.  However, the City has an ordinance which provides: "The city shall,
at all times, maintain full control of the airport.  The city shall adopt no ordinance,
resolution or motion and shall make no lease or contract with any person, including the
United States Government, which will impair the City's control of such airport and its
facilities. . . ."  Columbia, Mo., Ordinance § 3-3, Ord. No. 10665 (1985) (attached as Pl.
Ex. 38A).

Furthermore, the City still operates normal commercial air-traffic during the Air
Show period and, of course,  the tower is in operation for the Air Show.  Boston Dep. at
21:6-21.  Boston testified that the Airport "remains open" but that the airspace "may be

19

closed at various times due to the aerobatic events" from the Air Show. Boston Dep. at 21:19-21. Boston also testified that in the event of an emergency, the Airport tower would order the Air Show to be stopped. Boston Dep. at 92:8-12. Then the Air Show airplanes would clear the runway or other emergency area and Boston's emergency crew from the Airport would respond to the emergency. Boston Dep. at 92:8-12. Pl. Ex. 5A-5E at ¶ 23.

### 2. *Planning and Coordinating Activities*

To conduct the Air Show, the Corporation must submit a Ground Operations Plan ("GOP") to the Federal Aviation Administration ("FAA") for approval. The GOP includes information regarding the flight restrictions, areas of access on airport grounds, hazardous material plan for the Air Show, integrity of the runway and taxiway safety areas, movement area maintenance, crowd barriers, parking for aircraft, debris control, noise, fueling of aircraft, protection of the public, authorized vehicles, and other aspects of Airport oversight. Pl. Ex. 22. For 2004 and 2005, Boston prepared the entire GOP for submission to the FAA except for the schedule of events contained therein. Pl. Ex. 22 and 27; Boston Dep. at 14:6-24.

Boston and the other Airport staff incur additional job-related duties as a result of the Air Show. Boston Dep. at 62:12 to 63:8. The Corporation did not reimburse the City for any of these employees' time spent working on the Air Show. Boston Dep. at 63:9-13. In a June 2003 memorandum to the Columbia City Council, Beck also acknowledged that "[w]hile no direct financial support comes from [the City] for [the Air Show], the city does provide some in-kind support through airport staff time." Pl. Ex. 37.

20

Boston's help is undisputedly essential to the Air Show. Boston has described the Airport's role in the Air Show as a "community partner" and as a "host." Pl. Ex. 25C; Boston Dep. at 81:1-4. In fact, Boston stated that without the City's support, the "Air Show couldn't take place." Boston Dep. at 9:8-12. In her deposition, Posner described Boston as "absolutely essential" to the Air Show's continuation. Posner Dep. at 151:21 to 152:2.

### 3. Air Boss Briefings and Meetings

Numerous City officials participated in the Air Boss briefings that immediately led up to and during the course of the Air Show. In his deposition, Boston estimated the Air Boss briefings took place both days of the Air Show and possibly on the Friday preceding the Air Show and the Monday immediately thereafter. Boston Dep. at 51:10-15. Specifically, Boston, the air traffic controller, an FAA representative, the City's fire chief, and Martin all participate in the briefings. Pl. Ex. 9.

In addition to the Air Boss briefings, Boston and Martin both regularly attend the Corporation's monthly meetings to plan for the upcoming Air Show. Boston Dep. 46:8-24.

### 4. Transportation

During the Air Show, The City helped coordinate shuttle services to and from the Airport to help alleviate parking limitations. In 2004, a City police officer arranged for a shuttle to be provided by a private organization to shuttle attendees to and from the Air Show. Martin Dep. at 73:3-6. Also in 2004, Martin was listed as a primary contact for the Air Show in an article published by The Columbia Missourian that discussed the shuttle service to the Air Show. Pl. Ex. 21.

### 5.      *Security*

#### a.      Security Plan

Prior to each Air Show, Martin and Boston work together to prepare a Security Plan. Under the Security Plan, Martin coordinates security for the public-access areas of the tarmac while Boston plans security for the non-public areas of the tarmac, including the airfield, taxiways, runways, and grassy areas. Boston Dep. at 36:14 to 38:15. During the Air Show, City police officers act in accordance with a Security Detail prepared by Martin, which is included as Pl. Ex. 29. The Security Detail outlines the uniform for the Air Show and specifies the rules for the Air Show, including the ban against "protesting." Pl. Ex. 29.

#### b.      Personnel

The City police coordinate security for the Air Show. Posner Dep. at 103:25 to 104:4. In his role as a Columbia police officer, Martin has coordinated and directed security at the Air Show since 2001. Martin Dep. at 10:20-24. In addition to the City police, other agencies also provide personnel for security at the Air Show, including the Missouri State Highway Patrol, the Boone County Sheriff's Department, and the University of Missouri Police Department. Martin Dep. at 74:10-25. Each of the governmental agencies that employ these security officers pay their officers out of their respective operating budgets; the Corporation provides no reimbursement for the officers' time. Martin Dep. at 76:5-20. The City alone incurred over $15,000 in overtime compensation for providing its police officers for the Air Show, and this figure does not include time that officers committed to the Air Show during their regular work schedules. Pl. Ex. 42; Martin

Dep. at 83:21-25.

In addition to his other air-show-related duties, Martin annually attends the International Convention of Air Shows where he receives training and attends workshops related to Air Show security. Martin Dep. at 17:4-14. Posner and other Corporation officials also attended the Convention, but Martin was the only governmental employee to attend. Martin Dep. at 17:6-20. The Corporation pays for Martin's expenses at the Convention, but the City pays his salary while he attends the Convention during working hours. Martin Dep. at 17:21 to 18:12. The Convention includes a session regarding First Amendment activity at Air Shows and includes information for how to handle free speech activity during Air Show functions. Martin Dep. at 19:9-24.

### 6. *Emergency Services*

The City provides emergency services in the form of "crash, fire and rescue protection services, surveillance and equipment" during the Air Show. Pl. Ex. 5A-5E. Under the agreements, the Corporation does not pay for these services. Pl. Ex. 5A-5E. Boston helps coordinate the additional emergency services needed for the Air Show. Boston Dep. at 30:2-17. Some of these additional emergency services include support from the Boone County Fire Districts and the various ambulance services around the City. Boston Dep. 33:19 to 34:1. Posner testified at the hearing that the University of Missouri-Columbia provides some of its ambulances to support the Air Show.

### 7. *Miscellaneous Services*

The City also provides recycling bins for the Air Show, Boston Dep. at 43:14 to

23

44:10; and a pavement sweeper and a driver to keep the tarmac clean. Boston Dep. at 48:6 to 49:14. It has sent out articles about the Air Show with its utility bills which go to approximately 45,000 residents. Beck Dep. at 27:9 to 29:3. Pl. Ex. 13. In 2004, the City ran a front-page article about the Corporation's Air Show in CitySource, a City publication, but the Corporation did not pay any fee for the article to appear in CitySource.

The City's website also advertised the Air Show. In 2004, the City's website advertised the Air Show in the section of the City's website where residents could pay their utility bills. Pl. Ex. 30. The website invited the general public to attend the Air Show and "spend the day as we Honor and Remember our Nation's and our Allies' veterans, and say 'Thank You!' to current active duty members of our Armed Forces, members of the National Guard and Reserve and Allied Forces." Pl. Ex. 30. Moreover, on the Airport's official website, there is a link to the Corporation's website. Pl. Ex. 36D.

### 8. *Public Confusion and Sponsorship*

In its press releases and other materials, the Corporation tries to distance itself from the perception that the Air Show is sponsored by the City. In a 2004 Fact Sheet, the Corporation stated: "PLEASE NOTE: This event is in no way a function of or sponsored by the City of Columbia, its Chamber of Commerce, or the Columbia Convention/Visitors Bureau." Def. Ex. 155. In a Media Advisory dated April 2003, the Corporation stated:

> PLEASE NOTE: Do not refer to this as the "Columbia Airshow", "Columbia's" Memorial Day Airshow, this "Columbia event", "Columbia's Memorial Day Weekend", etc., or any other designation that would imply it is hosted, organized, or in any way produced or sponsored by the City of Columbia, Missouri. It is presented solely by [the Corporation], a registered

24

501(c)(3) not-for-profit corporation in the State of Missouri, which consists
of 3000 volunteers and 65 volunteer committee chairmen.  Media credentials
are mandatory.

Def. Ex. 152.

The City holds itself out as a sponsor of the Air Show.  To obtain federal military

aircraft, the Corporation must submit specific applications to the armed forces and the

FAA.  In the applications, Beck signed in his official role as City Manager verifying that the

Airport was available for the Air Show and that the Air Show was "officially supported by

local government."  Pl. Ex. 6 and 7.

Assistant City Manager Hiram Watkins has denied that the City is a sponsor of the

Air Show, but admitted that its relationship is "more of a partnership."  Watkins Dep. 20:16.

Boston said that the Airport "hosted" the Air Show.  Boston Dep. 80:19 to 81:4.

## III.    Standard of Review - Preliminary Injunction

In determining whether to grant a preliminary injunction, courts weigh four factors:

(1) the probability that the movant will succeed on the merits; (2) the threat of irreparable

harm to the movant; (3) the balance between the harm to the movant and any harm that

granting the injunction will cause to other parties to the litigation; and (4) the public

interest.  *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981).  In the

context of First Amendment cases, courts normally assume irreparable injury because

"[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably

constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (citing *New

York Times Co. v. United States*, 403 U.S. 713 (1971)).  In *Iowa Right to Life Committee,*

25

*Inc. v. Williams*, 187 F.3d 963 (8th Cir. 1999), the Eighth Circuit adopted this same

approach citing with approval the above language from *Elrod*. *Id.* at 970. Regarding the

public interest and balancing of harm prongs of the *Dataphase* factors, the court added,

"[T]he potential harm to independent expression and certainty in public discussions of

issues is great and the public interest favors protecting core First Amendment freedoms."

*Id.*

Thus, because of the inherent public interest in free speech and the threat of

irreparable injury if speech is suppressed, courts rarely focus on the three latter *Dataphase*

factors; instead, they look primarily to whether the party seeking the preliminary injunction

is likely to succeed on the merits. Following this precedent, the Court finds that Plaintiffs,

and those similarly situated, will sustain irreparable harm if their constitutional right to

speech is violated. While Wickersham has expressed ambivalence about attending the Air

Show, Doyle asserts that she plans to attend to distribute leaflets and it is clear she will be

subject to criminal sanctions if she does so. The public has an interest in preventing

constitutional violations, particularly ones involving speech, and the rights of the City and

the Corporation will only be curtailed to the extent required by law.

## IV.     Are the Defendants State Actors When They Restrict First Amendment Activities at the Air Show?

The City of Columbia is a state actor because it is a creation of the state. *See*

*O'Hare Truck Service, Inc. v. City of Northlake*, 518 U.S. 712 (1996). It is also treated as

a person for purposes of section 1983 and, therefore, can be held liable for constitutional

violations if they are caused by an official city custom or policy. *Monell v. Dep't of Social Services of New York*, 436 U.S. 658, 690 (1978). The City, however, argues that because it only enforces the Corporation's rules against leafleting and petitioning, it is not responsible for limiting Plaintiffs' speech activities. The Corporation claims that because it is a private party, it has the right to control all the speech on the tarmac, just as if it were real estate owned by the Corporation.

If the Corporation is a "private party" and the Air Show is held on their "private property," then Plaintiffs have no right to speech of any kind at the Air Show. A private party has the right to prevent free speech on its property, for a good reason, a bad reason, or no reason. "One great object of the Constitution is to permit citizens to structure their private relations as they choose, subject only to the constraints of statutory or decisional law." *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 619 (1991). On the other hand, if the Corporation is a "state actor" when it restricts speech, then in that limited context it will be treated like the government. *Lee v. Katz*, 276 F.3d 550, 555 (9th Cir. 2002) ("It is important to identify the function because '[a]n entity may be a State actor for some purpose but not for others.'") (quoting *George v. Pacific-CSC Work Furlough*, 91 F.3d 1227, 1230 (9th Cir. 1996)).

The Supreme Court has acknowledged that the state action doctrine has not been a model of consistency, perhaps because it is so fact dependent. *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288, 295 (2001); *Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 632 (1991). There is no single test for determining

27

when there is state action, particularly when the dispute involves the First Amendment.

Ronald B. Rotunda & John E. Nowak, 2 *Treatise on Const. L.*, § 16.4 n.1 (3d ed.). *See also Lee v. Katz*, 276 F.3d 550, 554 (9th Cir. 2002).

In *Edmonson*, the Supreme Court held that two inquiries were paramount. First, does "the claimed constitutional deprivation[] result from the exercise of a right or privilege having its source in state authority . . . ." *Edmonson*, 500 U.S. at 620. Second, "whether the private party charged with deprivation could be considered in all fairness a state actor . . . ." *Id.* at 620. Relevant factors to consider are: the actor's receipt of governmental assistance and benefits, *Edmonson*, 500 U.S. at 621; whether the actor is performing a traditional governmental function, *Id.*; are the government and the private entity so entangled that it appears that the private entity is acting in concert with the government, *Brentwood*, 531 U.S. at 296; whether there is such a close "nexus" between the government and the challenged action that it is fair to treat the private actor like the state, *Id.* (citation omitted); does the government provide "significant encouragement either overt or covert," *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982); and does a private actor operate as a "willful participant in joint activity with the state or its agents." *Brentwood*, 531 U.S. at 296 (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941 (1982)) (overview of factors). *See also Johnson v. Rodrigues*, 293 F.3d 1196, 1203-05 (10th Cir. 2002) (citations omitted); *Mentavlos v. Anderson*, 249 F.3d 301, 313-14 (4th Cir. 2001); John Fee, *The Formal State Action Doctrine and Free Speech Analysis*, 83 N.C. L. Rev. 569 (March 2005). This list is not all inclusive because the state action doctrine is

28

contextual and no single factor is necessary for there to be state action. *Brentwood*, 531

U.S. at 296. In *Brentwood*, the Court stated:

> What is fairly attributable is a matter of normative judgment, and the criteria
> lack rigid simplicity. From the range of circumstances that could point
> toward the State behind an individual face, no one fact can function as a
> necessary condition across the board for finding state action; nor is any set
> of circumstances absolutely sufficient, for there may be some countervailing
> reason against attributing activity to the government.

531 U.S. at 295-96 (citations omitted).

In this case, there is evidence that the City has delegated to the Corporation

functions traditionally and exclusively performed by government. The City Police are

instructed by the City to report during the Air Show to the Corporation's representative,

Mary Posner, and to follow her directives. Martin Dep. 51:21 to 52:1; Pl. Ex. 43

(instructing officers to contact a Corporation representative in the event of protesters).

They will remove any people from the show that she tells them to exclude.[10] The police do

not exercise discretion, but instead follow her directive.[11] *Id.*

Of course, merely providing police protection for a civic event does not transform

a private entity into a state actor. *Reinhart v. City of Brookings*, 84 F.3d 1071 (8th Cir.

---

[10]The City police officer in charge of security at the Air Show testified, "if [Posner] says that she does not want somebody on her property, regardless of what her reasoning is, I would ask that person to leave." Martin Dep. 67:24 to 65:2.

[11] Her power is so absolute that the police would exclude someone because of their race if they were told to do so by Posner. *See* Martin Dep. 68:11 to 69:6. While there is no evidence that the City, the Corporation or Posner has ever excluded anyone from the Air Show based on race or any protected status other than speech, the willingness of the police to take this extreme action illustrates the expansive delegation of authority given to Posner.

29

1996); *United Auto Workers, Local No. 5285 v. Gaston Festivals, Inc.*, 43 F.3d 902 (4th Cir. 1994). The purpose of the City police force is to protect all citizens of the City and police officers routinely give tickets to people who are trespassing on private property. However, the Defendants have not provided another example of the City Police Department giving any other individual or organization the broad authority delegated to Posner. While she is not "chief of police for the weekend," as alleged by the Plaintiffs, she does have the power to direct the police, not just ask for their assistance, as is the norm for a private individual. No one can seriously contend that in other contexts it is the practice of the City police to automatically follow the directive of a private landowner without first exercising discretion.

While it is true that security is not a function exclusively conducted by the government, only persons authorized by the government to arrest people have the power to physically deprive a citizen of their freedom. *See Griffin v. Maryland*, 378 U.S. 130 (1964). There, the Supreme Court held that a security officer employed by an amusement park was a state actor because the county had made him a special deputy and gave him a badge. He worked for the amusement park and he took his directions from the amusement park, but his power to arrest came from the sheriff and, therefore, he was a state actor, because only the state has the power to arrest. In this case, that power has been delegated to Posner to exercise as she deems appropriate. Furthermore, when making that delegation of authority, the City knew that she would exercise that authority to exclude First Amendment activity and gave her contractual authority to do so. This is not a case of mere

30

acquiescence.

In *Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982), the Supreme Court ruled that a creditor was a state actor when it took advantage of a state authorized procedure that permitted it to get a pretrial writ of attachment based solely on the creditor's ex parte affidavit. The use of the judicial system to get the writ and the involvement of the county sheriff in executing the writ was sufficient. In *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614 (1991), the Supreme Court held that a litigant who exercised a peremptory challenge was a state actor because the state gave it the power to strike a juror and then enforced the discriminatory choice when made. Similarly, in this case, Plaintiffs' claimed constitutional deprivation occurred because the City authorized the Corporation to have exclusive control of public property knowing that the Corporation would restrict speech and then the City police automatically enforced the Defendants' decision to exclude free expression.

In *Parks v. City of Columbus*, 395 F.3d 643 (6th Cir. 2005), the plaintiff attempted to carry a religious sign and preach at an arts festival held on a blockaded street. The event was open to the public and permitted by the city. Under those circumstances, the Sixth Circuit held that the City of Columbus committed a constitutional violation when the festival's off duty police officer removed the preacher at the direction of the festival organizer. This was in part because the city had stated in advance that the festival organizer had complete discretion to exclude someone for exercising constitutionally protected rights.

31

While the Defendants claim that *Reinhart v. City of Brookings*, 84 F.3d 1071 (8th Cir. 1996), absolves both parties of any responsibility for the restrictions which have been placed on Plaintiffs' efforts to leaflet and petition at the Air Show, *Reinhart* is distinguishable. In *Reinhart*, the City of Brookings only was being sued by a political candidate who wanted to have a booth at an art festival that was being held on city property but organized by and under the control of a private entity. The Brookings police patrolled the festival but did not give the festival organizers the authority to direct the police. The importance of this distinction is illustrated by *Reinhart*'s reliance on *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 157 (1978), which involved a creditor who was taking advantage of a state law which permitted self help to enforce a lien. The Supreme Court noted "that respondents have named no public officials as defendants in this action . . . . This total absence of overt official involvement plainly distinguishes this case from earlier decisions imposing procedural restrictions on creditors remedies . . . ." *Flagg,* 436 U.S. 149, 157 (1978). In the case before the Court, there is overt official action and the official action is controlled by Posner on behalf of the Corporation. The importance of this distinction is show by the *Lugar* case which distinguished *Flagg* because only self-help was involved in *Flagg* but the creditors in *Lugar* had used the power of the government to enforce its claim.

In addition to satisfying the government function test, the facts also show that there is such a degree of entanglement between the City and the Corporation that it appears that the Defendants are acting in concert and thus both are state actors when they prevent all

32

leafleting and petitioning at the Air Show. In *Reinhart*, the Eighth Circuit identified some

of the relevant considerations: (1) Insurance coverage; (2) who provides planning,

advertising, cleaning, managing and security; and (3) source of funds and benefits.

*Reinhart*, 84 F.3d at 1073; *see also Brentwood*, 531 U.S. at 311.

 Although the City and the Corporation claim that the Corporation has exclusive

control over the Airport tarmac[12] for the Memorial Day Weekend Air Show, it is simply not

true. The Airport Manager must retain control of the whole facility in order to comply with

City law. *See* Columbia, Mo., Ordinance § 3-3, Ord. No. 10665 (1985) (attached as Pl. Ex.

38A) ("The city shall, at all times, maintain full control of the airport. The city shall adopt

no ordinance, resolution or motion and shall make no lease or contract with any person,

including the United States Government, which will impair the City's control of such

airport and its facilities. . . ."). Furthermore, the contract gives the Airport Manager the

authority to unilaterally resume control in the event of an emergency. By analogy to

property law, the City retains an easement.

 More importantly, the event does not just occur on the secured tarmac. The event is

the Air Show, which includes both the tarmac and the aerial displays. There is no evidence

that the Corporation has the ability to have these aircrafts flying in and about the Airport

without the integral involvement of the Airport staff, all of whom work for the City. Even if

---

 [12]At this stage of the proceeding, the Court understands this area to be the outlined portion of
the Airport identified as "Crowd Area Static Display" that is depicted in Pl. Ex. 22 at Bates No.
00370. The Court assumes that all other areas of the Airport remain in the control of the City.

the Corporation may decide who can come onto the designated tarmac during the event, few would come to the tarmac, but for the planes and the planes could not fly without the contemporaneous management of the Airport by City personnel. There is clearly a symbiotic relationship between the City and the Corporation.

The symbiotic relationship is further proven by the fact that the federal government will not send its million dollar planes without approval of the City and the involvement of the City's Airport personnel. Pl. Ex. 6 and 7; Posner Dep. 60:2 to 62:15. City officials recognize this interdependence when they characterize their relationship with the Corporation as a partnership. Pl. Ex. 25C; Boston Dep. 81:1-4 (stating that the City and the Airport are a "community partner" with the Corporation and that the Airport serves as a "host").

This symbiotic relationship is also evidenced by the fact that people have to be repeatedly reminded that the show is not to be referred to as the "Columbia" Air Show. Def. Ex. 148, 150, 151, 152, and 155. The fact that this confusion occurs is because of the reality of the situation. The average person would expect that an air show is sponsored by a governmental entity and not a private group when it occurs at a city airport, involves military planes and has services provided by the city, state, county, and federal governments. This appearance of state action is relevant because "[t]he recognition that certain government-owned property is a public forum provides open notice to citizens that their freedoms may be exercised there without fear of a censorial government, adding tangible reinforcement to the idea that we are a free people." *Int'l Society for Krishna*

34

*Consciousness, Inc. v. Lee*, 505 U.S. 672, 696 (1992). In Rotunda and Novak, 2 *Treatise on Const. Law*, § 16.4 (3rd ed.), the authors state: "Of course, if the private actor was the agent or business partner of the government, it would be subjected to constitutional restraints. However, even though there is no partnership, these contacts may give the appearance of government action."

In addition to donating the use of its Airport to the Corporation, the City makes other in kind contributions to the event. City employees are intricately involved with the planning and coordination of the Air Show. Airport Manager Boston prepares the GOP that the Corporation submits to the FAA, he attends monthly planning meetings for the Air Show, and he spends substantial time attending to other details of the Air Show. Boston Dep. 14:6-24 (preparation of the GOP) and 46:8-24 (monthly meetings). The City donates Boston's time and other Airport employees' time free of charge to the Corporation. Boston Dep. 63:9-13. Not surprisingly, Posner characterized Boston's involvement with the Air Show as "absolutely essential" to the Air Show's continuation. Posner Dep. 151:21 to 152:2.

Columbia Police Captain Martin is also intricately involved with the Air Show. Martin has coordinated and directed security for the Air Show since 2001 in his role as a City employee. Martin Dep. 10:20-24. In this role, Martin develops a Security Plan for the tarmac area of the show and he distributes a Security Detail to officers who will work security during the Air Show. Martin also attends an annual Air Show convention with the Corporation organizers, with the Corporation paying his expenses, but the City paying

35

Martin's salary while he is gone during working hours. Martin Dep. at 17:21 to 18:12. In addition, the City expends over $15,000 per year just in the form of overtime compensation for its officers that provide security to the Air Show. Pl. Ex. 42.

Finally, the City advertises the Air Show in its official publications and on its website, and the website for the Airport contains a direct link to the Corporation's website. Pl. Ex. 36D.[13]

*Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961), demonstrates that the City and the Corporation are sufficiently entangled to justify the conclusion that they are state actors. There, the Supreme Court held that a restaurant that rented space in a government parking garage was a state actor when its owners refused to serve blacks. The land and building were owned by the city and rented to the restaurant. *Id.* at 719. The Supreme Court said: "The State has so far insinuated itself into a position of interdependence with Eagle that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so 'purely private' as to fall without the scope of the Fourteenth Amendment." *Id.* at 725.

The Defendants are far more interdependent here than were the city and restaurant in *Burton*. Yet, Defendants try to distinguish *Burton* by saying it only applies to racial discrimination and the lease was long term, not short term. However, the Supreme Court continues to cite *Burton* in cases that do not involve race discrimination, *Brentwood*, 531

_____

[13]The City also provides other minor benefits to the Corporation.

36

U.S. at 311 (applying *Burton* symbiotic relationship test to high school athletic context);

*San Francisco Arts & Athletics, Inc. v. U.S. Olympic Committee*, 483 U.S. 522, 556-57

(1987) (applying *Burton* symbiotic relationship test to dispute over the use of the word

"Olympic"), and Defendants have not explained why a long term versus short term lease

makes a difference.  In fact, a short term lease increases the risk of confusion about the

City's relationship to the Corporation because it is so transitory, the public is unlikely to

recognize any change.

      *Reinhart v. City of Brookings*, 84 F.3d 1071 (8th Cir. 1996), gives further support

for the conclusion that there is a sufficient symbiotic relationship here to support a finding

of state action.  While *Reinhart* held that a city was not responsible for the actions of a

festival organization even though the festival was on city property, the Eighth Circuit

specifically noted that the festival received no funding from Brookings, was staffed by

volunteers and "had sole responsibility for planning, advertising, cleaning, managing and

securing the 1994 festival.  Except for a Brookings police officer who patrolled the area,

the committee reimbursed the city for any city employees who helped clean and secure the

festival grounds."  *Reinhart*, 84 F.3d at 1073.  In contrast, the Corporation is given access

to the infrastructure of the Airport, pays for none of the extensive support provided by the

City, county, state, and federal governments, and uses the City's status to make

arrangements for the actual Air Show.  The City police do not merely patrol the area, as in

*Reinhart*; they are told to comply with the directives given by the Corporation's

representative.

37

In *Chicago Acorn v. Metropolitan Pier and Exposition Authority*, 150 F.3d 695, 697-99 (7th Cir. 1998), the Metropolitan Pier and Exposition Authority (MPEA), which was a governmental unit, rented the entire Navy Pier to the Democratic Party for one dollar. The Seventh Circuit held that all First Amendment activity, including leafleting, could not be banned from the entire pier even though the pier had been rented to a private party. The court noted that the pier was publicly owned and "so its owner, the MPEA, is subject to the First Amendment and as a result its discretion is curtailed." *Id.* at 699.

For other cases supporting a finding of state action, *see Lee v. Katz*, 276 F.3d 550 (9th Cir. 2002) (state action where private organization given exclusive control over free speech activities in a public forum); *Mood For A Day, Inc. v. Salt Lake County,* 953 F. Supp. 1252 (D. Utah 1995) (non-governmental fair board treated as state actor). *Also see*, John Fee, *The Formal State Action Doctrine and Free Speech Analysis*, 83 N.C. L. Rev. 569, 571, n.8 (March 2005) (private entity likely to be treated as state actor if government retains an easement on property deeded to private entity).

*United Auto Workers, Local No. 5285 v. Gaston Festivals, Inc.*, 43 F.3d 902 (4th Cir. 1995), another authority relied on by the Defendants, is distinguishable. In that case the Fourth Circuit held that a festival is not a traditional exclusive governmental function and, therefore, the festival organizers were not state actors. "The government has not traditionally been the sole provider of community entertainment. Nor has it traditionally been the exclusive organizer of festivals, parades, or fairs. Fairs and festivals such as the Fish Camp Jam have traditionally been administered primarily by private organizations, like

38

churches, civic groups, or local business consortiums." *Gaston*, 43 F.3d at 908. The

Fourth Circuit went on to hold that "[t]he possession of a permit to perform on public

property what are ordinarily private functions does not convert the permit holder into a

state actor." *United Auto Workers*, 43 F.3d at 910 (citing *Jackson v. Metropolitan*

*Edison Co.*, 419 U.S. 345, 357 (1974)). In support of this conclusion, the Fourth Circuit

said:

> Were we to hold that the incidental power to exclude others from public
> property during the course of a limited, permitted use transformed the permit
> holder into a state actor, softball teams on the Mall in Washington, D.C.
> would be constitutionally obliged to afford due process to those not allowed
> to play on the particular field at the same time. Every family that barbecues
> at a public park would theoretically be barred from excluding uninvited guests
> on constitutionally suspect grounds. The local church could no longer use
> public facilities to hold events for fear of violating the Establishment Clause.
> Every picnic, wedding, company outing, meeting, rally and fair held on public
> grounds would be subject to constitutional scrutiny merely because the
> organizer "had been granted exclusive use of city facilities . . . as well as
> authority to determine who may use those . . . facilities and what they may say
> while on the public fora."

*Gaston*, 43 F.3d at 911.

In contrast, an air show is not "traditionally . . . administered . . . by private

organizations like churches, civic groups or local business consortiums," *Id.* at 908, and in

*Gaston* the city played no role in planning or managing the festival, although the city did

donate $10,000 annually. Nor did the city delegate police authority to the festival

organizers. The *Gaston* court distinguished *Evans v. Newton*, 382 U.S. 296 (1966),

specifically, because the city in *Newton* had continued to be involved in the park even after

it relinquished ownership. In fact, *Gaston* never actually addressed the entanglement

doctrine. The Fourth Circuit only considered the exclusive government function factor. This is evident from the Fourth Circuit's public policy concern about the collateral consequences of finding state action when a permit holder is deemed to be a state actor.

The Fourth Circuit was rightfully worried about making private events public merely because they were being held on public land. These concerns, however, are not present here because the City remains deeply involved in the staging of the Air Show. To find that the Corporation is not a state actor also raises public policy concerns. Can a city avoid its constitutional obligation merely by the formality of a contract without in fact disengaging itself from the substance of the event? A wink and a nod should not be enough to eliminate the protections of the Constitution. *See Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288. "[I]f formalism were the *sine qua non* of state action, the doctrine would vanish owing to the ease and inevitability of its evasion, and for just that reason formalism has never been controlling. For example, a criterion of state action like symbiosis . . . looks not to form but to an underlying reality." *Id.* at 302.

For similar reasons, *Lansing v. City of Memphis*, 202 F.3d 821 (6th Cir. 2000) is not persuasive, both because it is factually distinguishable and because it is inconsistent with Supreme Court precedent. In that case, the Sixth Circuit declined to find that a festival organizer was a state actor. The festival organizer in *Lansing* provided its own security, and the public had to pay for admission to the event. The area surrounding the event was open to the public and it was in this public area that the city police evicted a preacher because the festival organizers found him offensive. The Sixth Circuit said that the festival organizer

40

was not a state actor under the exclusive state function doctrine because the preacher was not on property controlled by the festival. In contrast, the Corporation is directing the City police on City property that has been temporarily given to the Corporation by the City for an Air Show that necessitates the continued involvement of City Airport personnel and police. The Sixth Circuit recognized the importance of this distinction in *Parks v. City of Columbus*, 395 F.3d 643 (6th Cir. 2005), when it said: "We have indicated that authorization of exclusive use of public property will shift potential liability from the government to the private entity who functions as a state actor." *Id.* at 652. In *Parks*, the Sixth Circuit found there was state action with facts analogous to the dispute at hand.

Moreover, the Sixth Circuit's insistence in *Lansing*, that virtually all the potential tests for determining state action must be satisfied to find state action is contrary to current Supreme Court precedent. *See Brentwood Academy v. Tennessee Secondary School Athletic Ass'n,* 531 U.S. 288 302-303 (2001). In *Brentwood*, the Supreme Court held:

> [I]t avails the Association nothing to stress that the State neither coerced nor encouraged the actions complained of. "Coercion" and "encouragement" are like "entwinement" in referring to kinds of facts that can justify characterizing an ostensibly private action as public instead. Facts that address any of these criteria are significant, but no one criterion must necessarily be applied. When, therefore, the relevant facts show pervasive entwinement to the point of largely overlapping identity, the implication of state action is not affected by pointing out that the facts might not loom large under a different test.

*Id.* at 303. *Brentwood* also undermines any suggestion advanced by Defendants that the Eighth Circuit does not use the symbiotic relationship test except in race discrimination

41

cases.  *See Lubin v. Crittenden Hospital Ass'n*, 713 F.2d 414, 416 (8th Cir. 1983); *also see San Francisco Arts & Athletics, Inc. v. United States Olympic Committee*, 483 U.S. 522, 556-57 (1987).

Finally, Defendants suggest that the facts in *Sistrunk v. City of Strongsville*, 99 F.3d 194 (6th Cir. 1996), show much more entwinement between a government and a private entity, yet the Sixth Circuit found that city not liable for excluding *Sistrunk* from a public event held on public property.  The Sixth Circuit, however, declined to decide the issue of state action in *Sistrunk* and relied on other grounds for its conclusion.  In a nearly contemporaneous case, *Schwitzgebel v. City of Strongsville*, 97 F.3d 1452 (6th Cir. 1996), the lower court had found there was state action with even less involvement than in *Sistrunk* and the decision was affirmed without discussion of the state action issue.

The Defendants cannot have it both ways, assuming all the benefits of a partnership but accepting none of the burdens.  They act like partners; they are perceived to be partners; and therefore they cannot avoid the consequences of their choices by simply giving the Corporation exclusive, contractual control over the tarmac.  They are both state actors when they implement and enforce the Corporation's rules concerning speech at the Air Show.

## V.     Hurley

During the preliminary injunction hearing, the City and the Corporation focused heavily on the case of *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557 (1995).   The City claims that because of *Hurley*, it is

42

constitutionally prohibited from interfering with the Corporation's decision to prohibit all

leafleting, petitioning, protests, etc. at the Air Show.  Therefore, it has no choice but to

enforce the rules established by the Corporation.

The City is wrong.  Because the Corporation is a state actor in the context of this

First Amendment dispute, *Hurley* is irrelevant.  In *Hurley*, the Supreme Court dealt only

with the First Amendment rights of competing private actors.  However, even if the

Corporation was not a state actor, the City has the power to require the Corporation to open

up the tarmac to leafleting and petitions because *Hurley* is no impediment.

In *Hurley*, a homosexual rights group sued a private organization that sponsored an

annual St. Patrick's Day parade for permission to include a float in the parade.  The group

that organized and sponsored the parade was an unincorporated association of veterans who

obtained a permit from the City of Boston, Massachusetts, every year.  The Court held that

the parade organizers, as a private organization, had a First Amendment right to express a

certain viewpoint and, as a corollary to that right, the parade organizers could exclude

homosexual groups whose message conflicted with the parade's message.  The Supreme

Court applied this same rational in *Boy Scouts of America v. Dale*, where it held that the

Boy Scouts, as a private organization, had a First Amendment right to express and convey

certain values and that right authorized the Boy Scouts to exclude homosexuals from

leadership positions.  530 U.S. 640 (2000).

The Supreme Court in *Hurley*, however, only addressed whether parade organizers

could be compelled to allow the gay rights group to *participate* in the parade.  In fact, the

43

Court in *Hurley* repeatedly referred to the gay rights organization's attempt to participate in the parade--not just attend it. *See Hurley*, 515 U.S. at 570, 573 (the court emphasized that the gay rights organization wanted to participate "as a unit in the parade . . . for the very purpose of marching in it . . . ."). Moreover, the *Hurley* opinion stated that allowing the gay rights organization to participate in the parade "essentially requir[ed] [the parade organizers] to alter the expressive content of their parade" because "every participating unit affects the message conveyed by the private [parade] organizers." *Id.* at 573. Thus, *Hurley* decided whether compelled participation in a privately organized event that would alter the message of the event violated the private organizer's First Amendment rights--not whether compelled attendance in a private event that does not impact the organizer's message violated the organizer's First Amendment protections.

Other courts have recognized this distinction in *Hurley*. For example, in *Sistrunk v. City of Strongsville, Ohio*, the court pointed out that the gay rights advocates in *Hurley* could have lined the streets of the parade as non-participants and still disseminated their message. 99 F.3d at 199 (6th Cir. 1997). In *Sistrunk*, the issue was whether a Republican organization could exclude Democrats from a rally for a Republican candidate that was held on public property. In denying the Democrats' challenge to the Republican policy, the court compared the rally attendees' participation in the event to marchers in the *Hurley* parade and noted, "participating in the rally [for a Republican candidate] as a member of the audience is more akin to marching in the parade itself . . . ." *Id.* at 199. Thus, the Democrats were denied entrance because their mere attendance and protest at the rally was

44

tantamount to participating in the parade and that would have impeded the organizer's

message.

The court in *Gathright v. City of Portland, Oregon*, also considered *Hurley* and

applied the same distinction between participation and attendance. 315 F. Supp. 2d 1099

(D. Oregon 2004).[14] In holding that *Hurley* did not apply to a private organization's attempt

to keep out a proselytizer at a public event, the court stated:

> There is a distinction between participating in an event and being present at
> the same location. Merely being present at a public event does not make one
> part of the event organizer's message for First Amendment purposes . . . .
> there is an important constitutional difference between forcing a permittee to
> include a dissenter as a participant in a defined event where the public will
> reasonably conclude the dissenter's message is part of or sanctioned by the
> permittee, and excluding a dissenting speaker who is simply located at an
> event either to protest the permittee's message or to take advantage of a
> crowd to proselytize.

315 F. Supp. 2d at 1103. Noting that the private organizer's messages would have been

diminished if plaintiffs had prevailed in *Hurley* and *Sistrunk*, the court further stated:

> [I]n this case, there was no danger that any member of the public would
> attribute plaintiff's pietistic messages to the private organizers . . . Plaintiff's
> preaching was often unrelated to or directly contrary to the ideas being
> expressed at these events. Going to an event to preach and carry signs
> bearing a religious message is distinct from attempting to participate [in the
> event].

*Id.* at 1104. Because there was no chance that the attending public would attribute the

_____

[14]The opinion cited herein from the *Gathright* court was issued after the Court of Appeals had
already affirmed the district court's preliminary finding that Portland's conduct violated the plaintiffs'
free speech rights. *See* 74 Fed. Appx. 810. Thus, the only issue before the court in the order cited
herein was whether plaintiffs were entitled to a permanent injunction. The court found that they were.
315 F. Supp. 2d at 1105.

plaintiff's message to the event organizer and the plaintiff's message was not consistent with the event organizer's, the court in *Gathright* held that the plaintiff was not seeking to participate in the event and *Hurley* did not control the outcome of the matter.

In the instant case, Plaintiffs are not seeking to participate in the Air Show. They have not requested access to the dais during the remembrance ceremony at the Air Show nor have they sought permission to run a booth on the tarmac. Instead, Plaintiffs want to stand on the tarmac and distribute leaflets and circulate petitions. Whether those leaflets support or oppose the Corporation's stated purpose is not for this Court to decide, particularly where such an interpretation is based on subjective beliefs. However, there can be no dispute that reasonable Air Show attendees would not associate or attribute Doyle's leaflets to the Corporation, particularly where Doyle's leaflets may be perceived by some attendees as being contrary to the views of the Corporation.

Like the proselytizer in *Gathright*, Plaintiffs go to the Air Show to distribute leaflets and circulate petitions that cannot possibly be attributed to the Corporation or its message. Such conduct is the equivalent of attending the parade and not participating in it. Because Plaintiffs are merely attending the Air Show, *Hurley* would not apply to the instant dispute, even if the Court had not found that the Corporation was a private actor.

## VI. Whether Proposed Conduct at Air Shows is Protected by First Amendment

The parties do not dispute that petitioning, leafleting and protesting are activities protected by the First Amendment. To some extent, all speech is protected by the First Amendment, except narrow categories that are deemed unworthy of the Amendment's full

46

protection, such as obscenity and "fighting words." *Eichenlaub v. Township of Indiana*,

385 F.3d 274, 282-83 (3rd Cir. 2004) (citing *R.A.V. v. City of St. Paul, Minnesota*, 505

U.S. 377, 382-90 (1992)).

In *Meyer v. Grant*, the Supreme Court stated the following when it invoked the First

Amendment to strike down a Colorado statute that prohibited paying petition circulators:

> The circulation of an initiative petition of necessity involves both the
> expression of a desire for political change and a discussion of the merits of
> the proposed change. Although a petition circulator may not have to persuade
> potential signatories that a particular proposal should prevail to capture their
> signatures, he or she will at least have to persuade them that the matter is one
> deserving of the public scrutiny and debate that would attend its consideration
> by the whole electorate. This will in almost every case involve an explanation
> of the nature of the proposal and why its advocates support it. Thus, the
> circulation of a petition involves the type of interactive communication
> concerning political change that is appropriately described as "core political
> speech."

486 U.S. 414, 421-22 (1988). *Also see Bernbeck v. Moore*, 126 F.3d 1114, 1117 (8th

Cir. 1997) (relying on *Meyer*); *Chiu v. Plano Independent Sch. Dist.*, 339 F.3d 273, 280

(5th Cir. 2003); *Walker-Serrano ex rel. Walker v. Leonard*, 325 F.3d 412, 418 (3rd Cir.

2003) ("The petition creates an environment that encourages speech of a kind central to the

First Amendment's concern.").

Just as circulating a petition is core political speech under the First Amendment,

distributing leaflets and handouts is also core political speech because both forms of

speech seek to influence public opinion. In *McIntyre v. Ohio Elections Comm'n*, the

Supreme Court stated that "handing out leaflets in the advocacy of a politically

controversial viewpoint is the essence of First Amendment expression." 514 U.S. 334,

347 (1995) (citing *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672

(1992)). In a subsequent opinion, the court reiterated, "Leafleting and commenting on

matters of public concern are classic forms of speech that lie at the heart of the First

Amendment," *Schenck v. Pro-Choice Network of Western New York*, 519 U.S. 357, 377

(1997), and that the right to freedom of speech "embraces the right to distribute literature,

and necessarily protects the right to receive it." *Martin v. City of Struthers, Ohio*, 319

U.S. 141, 143 (1943). Similarly, the Supreme Court acknowledged the historical

importance of leaflets when it wrote, "[Leaflets] have been historic weapons in the defense

of liberty, as the pamphlets of Thomas Paine and others in our own history abundantly

attest." *Lovell v. City of Griffin, Georgia*, 303 U.S. 444, 452 (1938).

## VII.     The Tarmac as a Forum for Free Speech Activities

Under First Amendment analysis, it is fundamental that the "existence of a right of

access to public property and the standard by which limitations upon such a right must be

evaluated differ depending on the character of the property at issue." *Perry Educational

Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983). In *Perry*, the Supreme

Court divided government-owned property into three categories: (1) traditional public fora;

(2) designated public fora; and (3) non-public fora. The parties agree that the Air Show

venue is not a traditional public forum. Plaintiffs contend it is a designated public forum

and Defendants contend it is a nonpublic forum.

### A.     Designated Public Fora

A designated public fora is "public property where the government intentionally

allows discourse." *Families Achieving Independence and Respect ("FAIR") v. Nebraska Dep't of Soc. Services*, 111 F.3d 1408, 1418 (8th Cir. 1997). Thus, a designated public fora is created when the government sets aside public property "for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788, 802 (1985); O'Neill, 45 Loy. L. Rev. at n.36. Examples of designated public fora include university meeting facilities and municipal theaters. O'Neill, 45 Loy. L. Rev. at 420 (citations omitted).

The government does not designate public property as a forum for free speech activities by inaction or by allowing the public to visit the property. *Lee*, 505 U.S. at 680; *Cornelius*; 473 U.S. at 802. Instead, the decision to designate public property as a public forum must be made "by intentionally opening a nontraditional forum for public discourse." *Lee*, 505 U.S. at 680 (quoting *Cornelius*, 473 U.S. at 802). To determine the governmental body's intent, courts often look to the body's policy and practice with respect to the property. O'Neill, 45 Loy. L. Rev. at 420 (citing *Cornelius*, 473 U.S. at 802).

In addition to the government's intent, courts also consider the location of the public property that was allegedly intended to be a designated public forum "because separation from acknowledged public areas may serve to indicate that the separated property is a special enclave, subject to greater restriction" than a traditional public forum. *Lee*, 505 U.S. at 680 (citing *United States v. Grace*, 461 U.S. 171, 179-80 (1983)). The purpose of looking at the location of the property is to discern whether the property is by

49

its nature "compatible with expressive activity." *Cornelius*, 473 U.S. at 802.

Thus, in evaluating whether the government has designated its property as a public forum, courts "will not find that a public forum has been created in the face of clear evidence of a contrary intent, nor will [courts] infer that the government intended to create a public forum when the nature of the property is inconsistent with expressive activity." *Id.* at 803.

If a governmental property is designated a public forum, then the government's restrictions on speech-related conduct must be "necessary to serve a compelling interest" and the regulation must be "narrowly drawn to achieve that end." *Perry*, 460 U.S. at 45; *also see FAIR*, 111 F.3d at 1418 (citing *Perry*, 460 U.S. at 46).

**B.      Nonpublic Fora**

Governmental property that is neither traditional public fora nor designated public fora is categorized as nonpublic fora. *FAIR*, 111 F.3d at 1419 (citing *Lee*, 505 U.S. at 678-79) ("The third category of fora, the nonpublic forum, consists of all other public property."). When it comes to restricting free speech conduct on nonpublic fora, the government "enjoys 'maximum control over communicative behavior' because its role 'is most analogous to that of a private owner.'" O'Neill, 45 Loy. L. Rev. at 420 (quoting *Paulsen v. County of Nassau*, 925 F.2d 65, 69 (2nd Cir. 1991)). The court in *Perry* described the government's role in restricting speech-related conduct on nonpublic fora as follows:

[T]he First Amendment does not guarantee access to property simply because

it is owned or controlled by the government . . . . As we have stated on several
occasions, the State, no less than a private owner of property, has power to
preserve the property under its control for the use to which it is lawfully
dedicated.

*Perry*, 460 U.S. at 46.  The Court in *Perry* stated the level of scrutiny for nonpublic fora

speech restrictions as:

In addition to time, place, and manner regulations, the state may reserve the
forum for its intended purposes, communicative or otherwise, as long as the
regulation on speech is reasonable and not an effort to suppress expression
merely because public officials oppose the speaker's view.

*Id.*

### C.    Forum Analysis

The Court finds that the Air Show is a nonpublic forum.  There is no evidence that

the City has ever designated the Airport tarmac as a public forum.  The tarmac is not open

to any members of the public except for the two-day time period of the Air Show.  Boston

Dep. at 112:1-20.  During these two days of the Air Show, the City allows pedestrians onto

the tarmac, but allowing the public to freely enter onto the tarmac is not determinative of

the issue; instead, the Court must consider whether the City "intentionally open[ed] [the

tarmac] for public discourse."  *Lee*, 505 U.S. at 680 (quoting *Cornelius*, 473 U.S. at 802).

There is no evidence that the City has ever intentionally invited public discourse onto the

tarmac, even during the two-day Air Show every May.

Because the tarmac qualifies as neither a traditional nor a designated public forum, it

must by default be a nonpublic forum.  *See FAIR*, 111 F.3d at 1419 (citing *Lee*, 505 U.S. at

678-79) ("The third category of fora, the nonpublic forum, consists of all other public

51

property.").  This position is consistent with the Supreme Court's finding in *Lee* that a

passenger airport terminal, which is analogous to the Air Show tarmac, was a nonpublic

forum.  *Lee*, 505 U.S. at 683 ("Although many airports have expanded their function beyond

merely contributing to efficient air travel, few have included among their purposes the

designation of a forum for solicitation and distribution activities.  Thus, we think that

neither by tradition nor purpose can the terminals be described as satisfying the standards

we have previously set out for identifying a public forum.").

The final question to be considered is whether leafleting, petitioning and protesting

can be prohibited altogether because the Air Show is a nonpublic forum.

## VIII.   What Restrictions are Reasonable?

In *Board of Airport Commissioners of Los Angeles v. Jews for Jesus, Inc.*, the

Court considered whether a resolution restricting free speech in the airport was

constitutional.  482 U.S. 569 (1987).  The resolution at issue stated that the airport "is not

open for First Amendment activities by any individual and/or entity."  *Id.* at 574.  Although

the Court did not explicitly find that the airport was a nonpublic forum, it did hold that the

resolution restricting speech in the airport was facially unreasonable, even if the airport

was a nonpublic forum.  *Id.* at 573.  The Court noted that enforcing the resolution would

prohibit "talking and reading, or the wearing of campaign buttons or symbolic clothing."  *Id.*

at 574.  The Court also noted, "Much nondisruptive speech--such as the wearing of a T-shirt

or button that contains a political message--may not be 'airport related' but is still

protected speech even in a nonpublic forum."  *Id.* at 575 (citing *Cohen v. California*, 403

Case 2:05-cv-04061-NKL   Document 57   Filed 05/18/05   Page 52 of 62

U.S. 15 (1971) (holding that wearing of jacket with offensive language in a courthouse was a form of nondisruptive expression that was protected by the First Amendment)). Thus, although specific conduct was not at issue in the *Jews for Jesus* decision, the Court nonetheless implicitly held that non-disruptive speech is protected by the First Amendment in nonpublic fora and that restrictions that encumber non-disruptive expression are unreasonable.

In her concurring opinion in *Int'l Society for Krishna Consciousness v. Lee*, Justice O'Connor set forth the test for determining reasonableness in the context of nonpublic fora. 505 U.S. 672, 687 (1992). She stated, "The reasonableness of the Government's restriction [on speech in a nonpublic forum] must be assessed in light of the purpose of the forum and all the surrounding circumstances." *Id.* (quoting *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 809 (1985)). At issue in *Lee* was whether a religious sect could solicit for donations and distribute leaflets in an airport, which the Court held was a nonpublic forum. Justice O'Connor distinguished between solicitations and distributing leaflets when she wrote:

> [Leafleting does not entail the same kinds of problems presented by face-to-face solicitation. Specifically, '[o]ne need not ponder the contents of a leaflet or pamphlet in order mechanically to take it out of someone's hand . . . . The distribution of literature does not require that the recipient stop in order to receive the message the speaker wishes to convey; instead the recipient is free to read the message at a later time.'

*Id.* at 690 (quoting *United States v. Kokinda*, 497 U.S. 720, 734 (1990)). Thus, the Court held in *Lee* that prohibiting solicitation in a nonpublic fora is not unreasonable, but that

Case 2:05-cv-04061-NKL   Document 57   Filed 05/18/05   Page 53 of 62

prohibiting the distribution of leaflets and other literature is unreasonable.

Circuit courts have also recognized the inherent right to distribute paper and other information in nonpublic fora. In *Jacobsen v. City of Rapid City, South Dakota* and *Multimedia Publishing Co. of South Carolina, Inc. v. Greenville-Spartanburg Airport Dist.*, two circuit courts have held that airports, as nonpublic fora, could not preclude newspaper publishers from placing newsracks in airport terminals. *See Jacobsen v. City of Rapid City, South Dakota*, 128 F.3d 660 (8th Cir. 1997); *Multimedia Publishing Co. of South Carolina, Inc. v. Greenville-Spartanburg Airport Dist.*, 991 F.2d 154 (4th Cir. 1993). To the extent that the airports were concerned about safety or the impediment of traffic flow, the courts held that the airport may impose reasonable restrictions, but they could not enforce an outright ban on the newspaper racks.

The Corporation has banned leafleting, petitions and protests. It is clear from *Lee* that the Defendants can ban all petitioning from the Air Show tarmac. It is equally clear from *Lee* and *Jews for Jesus* that the Defendants cannot ban all leafleting and "protest." However, leafleting and protest are subject to reasonable time, place, and manner restrictions so the Court will address each of the articulated justifications for the Corporation's ban on leafleting and protest, which are:

1. Interference with the public's enjoyment of the Air Show;
2. Litter;
3. These activities are not appropriate;
4. The activities interfere with the Corporation's First Amendment rights;
5. The Plaintiffs have alternative places to speak; and
6. The size of the crowd will increase

54

As to number one, the Corporation's concern that leaflets will interfere with the public's enjoyment of the Air Show is undermined by the fact that programs are being handed out and there are so many distracting activities on the tarmac that leaflets are unlikely to have any measurable impact on the ability of the public to see the aerial displays. Martin testified that at the Air Show convention he attends, the organizers are taught how to handle First Amendment activities, suggesting that these concerns have been adequately addressed elsewhere.

As to number two, the Defendants' litter argument is without merit, given the amount of paper products being distributed by the Corporation and its exhibitors and the precautions that have already been taken to deal with trash. There is no greater danger from leaflets than programs and hamburger wrappers. There is no evidence in fifteen years of this Air Show that there has been a safety problem associated with trash.

As to number three, the Corporation's argument that leafleting is not appropriate for the event, is an insufficient justification to ban all leafleting. The Corporation does not define what is appropriate or why leafleting is inappropriate, so it is difficult to identify their precise objection. The example that the Corporation's counsel used during oral argument suggests that family members would be upset by antiwar sentiments expressed during the Noon time memorial to honor fallen soldiers. The Court agrees that it would be inappropriate to detract from any program which honors the sacrifices of the men and women of the armed services. Defendants have a right to exclude all activity and speech during such a memorial, so long as the rules are uniformly enforced to preserve the

55

solemnity of the occasion.  However, as to the entertainment component of the Air Show, the Defendants cannot exclude all speech activities merely by claiming that the entire event is to honor and remember veterans so no other message is permissible.  This is content and viewpoint discrimination and therefore impermissible, especially in light of the Corporation's advertising policy that allows commercial advertising even where the advertising does not promote the Corporation's stated goals of honoring and remembering veterans.  The Air Show is a substantial asset to the community and the City and the Corporation should be recognized for what they have jointly accomplished, but words will not transform an entertaining Air Show with all the accouterments of a festival into a solemn occasion.

In *DeBoer v. Village of Oak Park*, 267 F.3d 558 (7th Cir. 2001), the Seventh Circuit illustrated how government impermissibly excludes speech from a nonpublic forum by definitional limitations. There, the Seventh Circuit held that the Village of Oak Park could not prevent a church from meeting in a public building to pray for governmental officials merely because the church would not "accommodate various view points on the civic topic." *DeBoer*, at 571.  The Village had argued that it only permitted groups which were presenting a civic program, and a church event involving prayer did not focus on citizens and their relationship with government.  The Seventh Circuit held that a prayer service in support of government could be a civic event.  "In adopting the philosophical and theological position that prayer, the singing of hymns and the use of Bible commentary can never be 'civic,' the Village has discriminated against the speech of those of its citizens

56

who utilize the forms of expression to convey their point of view on matters relating to government." *Id.* at 568.

As to number four, the Court has previously held that the Corporation's First Amendment rights will not be violated just because the public is permitted to engage in reasonable speech activities on the tarmac. However, the Corporation does retain complete control over who participates in the Air Show, occupies a booth or has a display on the tarmac. A reasonable person might assume that a participant in the Air Show "speaks" for the organizers.

As to number five, Defendants' argument that the Plaintiffs have an alternative place to speak, the Court has found no case which has held that forbidding all speech at a nonpublic forum is a reasonable restriction. By definition, the requirement that the limitations on speech at a nonpublic forum must be reasonable suggests that keeping all speech out of the forum is not an alternative. The only context where the availability of alternative fora is relevant is where the forum at issue is a traditional public forum--not a nonpublic forum and in such a case an alternative forum is just one requirement that must be met. *See Perry*, 460 U.S. at 45 (stating that in a traditional public forum, the "state may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication"). If the Supreme Court had intended to permit a state actor to forbid all speech at a nonpublic forum because there were alternative channels for expression, it would have said that the nonpublic forum restrictions must

*either* be reasonable or there must be an alternative place for expression. The fact that the Plaintiffs can distribute leaflets elsewhere in the Airport property is not a reasonable time, place or manner restriction.

As to number six, the Corporation's concern about the size of the crowd is not supported by the record. While many groups have sought to have a booth or display at the Air Show, the record does not show that many people have expressed an interest in leafleting. More importantly, this justification seems inconsistent with the Corporation's obvious effort to increase attendance and their pride at having increased attendance at the special Noon-time memorial to veterans. Logistical problems that actually arise because of leafleting crowds, if any, can be addressed with reasonable time, place and manner restrictions.

Finally, any other time, place and manner restrictions imposed by the Defendants must be content and viewpoint neutral and must be uniformly enforced. In the past, the rules have not always been uniformly enforced. Doyle was permitted to enter the event with a sign which said "God Bless Our Troops" and moved freely about the event for an hour and a half. Steve Jacobs could not even enter the tarmac because he carried a sign that said "God is Watching."

The Corporation's potential for viewpoint discrimination is particularly troubling because it has an unwritten rule banning all "protestors." Under the overbreadth doctrine, a regulation may be declared invalid on its face if its overbreadth is "substantial." *Board of Airport Commissioners of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 574 (1987)

58

(citations omitted). To be overbroad, "there must be a realistic danger that the [regulation] itself will significantly compromise recognized First Amendment protections of parties not before the Court . . ." *Id.* (quoting *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984)). *See also Van Bergen v. State of Minnesota*, 59 F.3d 1541, 1549 (8th Cir. 1995) (applying the same standard to overbroad challenges to First Amendment restrictions). In *Jews for Jesus*, the Supreme Court determined that a total ban on First Amendment activities inside an airport terminal was facially overbroad because it would prohibit things like "political buttons or symbolic clothing." *Id.* at 574. "Much nondisruptive speech--such as wearing a T-shirt or button that contains a political message--may not be 'airport related' but is still protected speech even in a nonpublic forum." *Id.*

Similarly, a court may invalidate a First Amendment restriction where it is unduly vague. The vagueness doctrine incorporates two basic considerations: (1) concerns about fair notice of what is acceptable conduct under the restriction, and (2) concerns about excessive discretion being invested in administering and enforcing officials. *Ridley v. Massachusetts Bay Transp. Auth.*, 390 F.3d 65, 93 (1st Cir. 2004) (applying vagueness doctrine to nonpublic forum) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972)). Courts impose increased vagueness scrutiny on regulations that impose criminal sanctions for participating in the prohibited protected activities. *Id.*

It is apparent at a minimum that the Defendants cannot exclude clothing, buttons or hats because they contain language which the Defendants interpret as protest.

## IX. Injunction Bond

Case 2:05-cv-04061-NKL   Document 57   Filed 05/18/05   Page 59 of 62

Under Fed. R. Civ. P. 65(c), this Court is required to impose an injunction bond. Fed. R. Civ. P. 65(c). In their brief, Plaintiffs aver that they do not have sufficient means to post an injunction bond in this case and Defendants do not contest Plaintiffs' claim that they have limited means. Nonetheless, Rule 65(c) mandates an injunction bond. Because neither party in this case will suffer monetary hardship by the issuance of the preliminary injunction and because the matter involves constitutional violations, the Court finds that a nominal injunction bond of $500 is appropriate.

## X.      Conclusion

Plaintiffs have asked for two specific things–to distribute leaflets and to seek signatures on petitions. The Supreme Court has given good guidance on both these issues in *International Society for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 689-93 (1992). In that case, the Supreme Court held that the owner of an airport could not prevent leaflets from being distributed in the airport terminal. "We have expressly noted that leafleting does not entail the same kinds of problems presented at face to face solicitations." Because leaflets could be taken mechanically and read at a later time, they were minimally intrusive and could not be banned altogether from the terminals. There was no pressure on the individual to stop and talk. Petitions are another thing. The Supreme Court, in *Krishna*, held that solicitations for money could be banned in the airport terminal because they were intrusive and were likely to demand a contemporaneous response from passengers on their way to a plane. Petitions are analogous to solicitations because the public must first read the petition before deciding to sign. A similar approach was taken by

60

Judge Posner in *Chicago Acorn v. Metropolitan Pier*, 150 F.3d 695 (7th Cir. 1998), where he held that leafleting could not be forbidden at a publicly owned entertainment venue even though it was being rented to the Democratic Party for one dollar.

The Court concludes that Plaintiffs can distribute leaflets at the 2005 Air Show, but they may not circulate petitions for signatures. The Court understands that the average citizen may not appreciate the fine distinction crafted by the Supreme Court, but this Court is obligated to follow precedent and clear precedent is particularly appreciated.

Finally, any restrictions on expression at the Air Show must be content and viewpoint neutral and not violate the overbreadth and vagueness doctrines. Therefore, expressive clothing, hats, and buttons cannot be banned as "protest" because they express a viewpoint disfavored by the Defendants.

Accordingly, it is hereby

ORDERED that Plaintiffs' Motion for Preliminary Injunction [Doc. # 54] is GRANTED in part and DENIED in part as follows:

(1)     Plaintiffs and similarly situated individuals may distribute leaflets at the Air Show subject to the permissible restrictions identified in this Order;

(2)     Plaintiffs and similarly situated individuals may not circulate petitions or engage in any other form of soliciting at the Air Show;

(3)     Defendants may not forbid all expressive clothing, hats, and buttons because they express a viewpoint disfavored by the Defendants; and

(4)     Plaintiffs must submit an injunction bond in the amount of $500, pursuant

61

to Fed. R. Civ. P. 65(c), within seven (7) days of the date of this Order.

 s/ NANETTE K. LAUGHREY____
NANETTE K. LAUGHREY
United States District Judge

DATE: May 18, 2005____
Jefferson City, Missouri