# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI CENTRAL DIVISION

| | | |
|---|---|---|
| BILL WICKERSHAM and MAUREEN DOYLE, | ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 05-4061-CV-C-NKL |
| | ) | |
| CITY OF COLUMBIA, MISSOURI and MEMORIAL DAY WEEKEND SALUTE TO VETERANS CORP., | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## ORDER GRANTING PERMANENT INJUNCTION[1]

## I.  Background

On May 18, 2005, the Court entered a preliminary injunction which permitted

Plaintiffs to distribute leaflets at the May 2005 Memorial Day Air Show ("Air Show")

and to wear expressive clothing, hats and buttons.  The Court denied Plaintiffs' request to

circulate petitions or engage in any other form of solicitation.  Subsequent to the 2005 Air

Show, the parties supplemented the factual record and provided additional briefing and

oral argument.  The Court must now determine whether a permanent injunction should

issue, taking into account the factual record presented at both the preliminary and

---

[1]The Court incorporates by reference its May 18, 2005 Order ("Order") [Doc. 57], including the facts which were included in that Order.

1

permanent injunction hearings.

## II. Supplemental Facts[2]

### A. Change in City Ordinance

On May 16, 2005, the Columbia City Council ("City") repealed Ordinance § 3-3, Ord. No. 10665 (1985), which stated: "The city shall, at all times, maintain full control of the airport. The city shall adopt no ordinance, resolution or motion and shall make no lease or contract with any person, including the United States Government, which will impair the City's control of such airport and its facilities, nor shall it enter into any agreement which may be contrary to the Federal Aviation Act." It appears that the City was not aware of this ordinance when it gave exclusive control of the airport tarmac to the Salute to Veterans Corporation ("Corporation") in 2000, 2001, 2002, 2003 and 2004. When it became aware of the ordinance, the City Counsel repealed it so that the City could legally contract with the Corporation for the 2005 Air Show.

### B. Change in Law Enforcement Protocol

Subsequent to the Court's May 18, 2005, Order, Mary McCleary Posner ("Posner"), the president of the Corporation, wrote a letter to Columbia's City Counselor notifying the City that the Corporation "will play no role in the exercise of authority and

---

[2]Because the 2005 Air Show has now passed, Plaintiffs' request for a permanent injunction, as it relates to the 2005 Air Show, is moot. However, both parties have indicated that this will be an ongoing dispute and both have requested the Court to take these additional facts into account to resolve the Plaintiffs' request for declaratory judgment and permanent injunction. Therefore, the Court has considered both these supplemental facts, as well as the facts that were presented at the preliminary injunction hearing, to resolve the Plaintiffs' request for declaratory judgment and permanent injunction.

2

discretion by the City Police and the supporting law enforcement officers from other agencies during the 2005 Air Show or at any other time or place. The City Police and supporting law enforcement officers will be acting on their own initiative and discretion in the enforcement of city ordinances and the laws of Missouri during the 2005 Air Show as they do at other times and places. Without limitation, this includes enforcement of laws against trespassing and offenses against public order." Def. Ex. 8. Thus, it now appears that the City Police will exercise independent judgment before removing Plaintiffs and similarly situated people from the airport tarmac. Def. Ex. 15 (Martin Dep.) at 10-14.

### C.    2005 Air Show

The 2005 Air Show occurred on May 29 and 30, 2005. The Corporation and the City complied with the Court's Preliminary Injunction Order which permitted leafleting and expressive clothing. While the Court's Order did not address the issue of signs, the Corporation and the City permitted signs to be carried during the Air Show. Plaintiffs have now requested the Court for a declaration that signs may be displayed at future Air Shows.

Approximately 25,000 to 27,000 people attended the 2005 Air Show. During the two-day program, there were ceremonies and speeches honoring veterans and current troops, aerobatic and static displays of aircrafts; a static antique automobile show; vendors selling souvenirs and books related to the military and war; armed forces recruiters and military exhibits, such as an Army climbing wall, Army NASCAR, Army

adventure van, Army shooting gallery, Navy Taj Mahal, Air Force Raptor and van, Marine Corps obstacle course, 128th Field Artillery Howitzer Battery and multiple national guard vehicles and pieces of equipment.

The 2005 Air Show also included a toy police car with robot driver; a swearing in ceremony for new recruits; advertisements honoring the military and veterans or simply advertising various private companies; and a radio station with a van broadcasting from the tarmac. Def. Ex. 188; Def. Ex. 15 (Martin Dep.) at 79:3-15, 94:1-95:2; Pl. Ex. 50; and Pl. Ex. 52.

Captain Martin testified that the pictures in Plaintiffs' Exhibit 50 accurately reflect the overall atmosphere of the Air Show. It is fair like and generally open except along the orange fence which is closest to the air display or where lines have formed for food or other activities.[3] Crowding also occurred when attendees were talking to, taking pictures with and obtaining autographs from parachutists on their souvenir program.

On both days of the Air Show, a group calling itself "Operation Simply Shred" approached attendees and asked if they wanted any leaflets shredded. There were at least two separate people with shredders on the tarmac during the Air Show. Def. Ex. 15 (Martin Dep.) at 19-22. *Also see* Def. Ex. 193 (Preckshot Dep.) at 29 (Preckshot admitted that shredders occasionally were on the tarmac), and Def. Ex. 189 (Sanders Dep.) at 6-7

---

[3]The food booths remained open during the solemn ceremony to honor fallen soldiers. Def. Ex. 15 (Martin Dep.) at 83:11-13. Although Posner testified that the food stalls were closed during this event, which occurred over the noon hour, the Court finds Officer Martin's testimony more credible.

4

(Sanders observed the shredders on the tarmac).

The people with shredders carried a recycling bag and would take any paper from the public, shred it and then use it as cat litter. Operation Simply Shred was organized in response to those persons at the Air Show who were distributing leaflets. *See* Def. Ex. 193 (Preckshot Dep.) at 6-9. "After a while, it gets to be too much. If they want their freedom of speech, then we have our freedom of speech." Def. Ex. 193 (Preckshot Dep.) at 22. On occasion, the public was permitted to put their leaflets in the shredder themselves. Def. Ex. 193 (Preckshot Dep.) at 26-27.

A television reporter interviewed Captain Martin and Plaintiff Bill Wickersham ("Wickersham") on the secured tarmac at the 2005 Air Show, and people had their lawn chairs on the tarmac. Pl. Ex. 52; Def. Ex. 15 (Martin Dep.) at 95-96:16,

### C.    Complaints at 2005 Air Show

None of these many and diverse events disrupted the 2005 Air Show. Operation Simply Shred did not create any disruption, Def. Ex. 15 (Martin Dep.) at 60:11-19, and no one complained about them. However, David Williamson, a firefighter, was upset when someone passed out leaflets during the national anthem. Def. Ex. 192 (Williamson Dep.) at 5:18-22. Also, Dr. Annette Sanders ("Sanders") testified that because someone handed her a leaflet she lost sight of the television crew that she was following, and, therefore, had a shorter interview with them once she found the reporters. Def. Ex. 189 (Sanders Dep.) at 20-23. There was also a person carrying an anti-war sign who walked in the area adjacent to the grandstand during the noontime program to honor veterans. Def. Ex. 15

5

(Martin Dep.) at 80-83.

In 2005, for the first time, the Corporation set up a tent that had a banner labeled "Comment Cards." Def. Ex. 189 (Sanders Dep.) at 11. They collected 54 comment cards and nine of those cards directly or indirectly contained complaints about the presence of anti-war protestors at the Air Show. Def. Ex. 189 (Sanders Dep.) at 12-16, 24-25, 33-34. The nine critical comment cards read as follows:

- "I enjoyed the Airshow, but was greatly disappointed in seeing the 'Un-American' protestors disgracefully passing out propaganda. I believe something needs to be done to them which limits their 'Un-American' tactics for the future air shows. It seems as if they don't understand who protects their freedoms.

- "No protestors in tarmac."

- The third one said that he was stopped fifty yards in the gate by someone with a copy of the Bill of Rights. "Almost ran into me, here for the heritage & sights, not politics."

- "I have one complaint. The guy with the sign (protesting) was the only one walking around during the National Anthem in front of grand central. These guys with protesting signs are the ones showing lack of respect to our country & to our veterans. Why are they in here?"

- "The protestors should not be allowed to walk around on the air field carrying their signs. The men & women in uniform do not need to see this.

6

It's the day to commemorate the military not protest them."

- "Get rid of protestors inside tarmac."

- "If at all possible keep demonstrators out!"

- "Please restrict the conscientious objectors & other unpatriotic demonstrators to designated areas where they do no(t) desecrate the memories of our veterans."

Additionally, Posner objected to the leaflets which were distributed by a little restaurant located in the airport terminal because people might go to the restaurant and drink and then return to the Air Show. Def. Ex. 190 (Posner Dep.) at 9:15-11:3. However, people could also go to their cars and drink and then return to the Air Show.

Posner testified that she had to move the Tuskegee airmen between the bagpipe players and the honored guests to ensure their protection because she feared the airmen might be confronted by members of the Ku Klux Klan. Def. Ex. 190 (Posner Dep.) at 16:5-17:15. She did not present any evidence that the Ku Klux Klan would attend the Air Show, much less disrupt it.

### D. Air Show Attendance

Posner and Sanders testified that attendance at the 2005 Air Show was down and they contend that the drop in attendance was because of publicity surrounding this lawsuit. However, there is no objective evidence in the record to show that any decline in attendance was related to the Plaintiffs' First Amendment activities. Posner and Sanders did not identify a specific year with a comparable program that had a higher attendance.

7

Nor does the record contain news articles or media coverage of the lawsuit.

## III.    Standard of Review - Permanent Injunction

The *Dataphase* factors applicable to a request for preliminary injunction are also used to evaluate a request for a permanent injunction, except the focus is on whether the Plaintiff has established the merits of the claim. *See Dataphase Systems, Inc. v. C L Systems, Inc*., 640 F.2d 109, 112-114 (8th Cir. 1981) (en banc); *Bank One, Utah v. Guttau*, 190 F.3d 844, 847 (8th Cir. 1999).

## IV.    State Action[4]

### A.    City

The City is a state actor because it is a creature of the state.  Nonetheless, the City argues that it has not violated the Plaintiffs' First Amendment rights by excluding them from Air Shows because City Police have only enforced rules established by a private entity.  Thus, any injury sustained by the Plaintiffs was caused by the Corporation, not the actions of the City.

As the Court has previously held, the Defendants cannot assume all the benefits of a partnership but accept none of the burdens.  The City and the Corporation act like partners; are perceived to be partners and are mutually benefitted by their relationship. The City cannot avoid responsibility for its actions by simply giving control of the tarmac

---

[4]The Court will not restate here the legal authority for its conclusions.  Its May 18, 2005 Order is incorporated verbatim and contains the relevant legal authority.

Case 2:05-cv-04061-NKL   Document 100   Filed 03/31/06   Page 8 of 22

to the Corporation, especially while the City retains an easement to re-enter, and actively

assists the Corporation by operating the airport during the Air Show.  Because of the

special relationship between the City and the Corporation, this case is not governed by

*Reinhart v. City of Brookings*, 84 F.3d 1071 (8th Cir. 1996).  In addition, because the

Columbia Police will now be exercising discretion if they remove Plaintiffs or similarly

situated persons from the tarmac, the City cannot claim that it is merely following the

directive of a private party.

### B.      Corporation

Because the Corporation has disavowed any special control that it once had over

the Columbia Police at the Air Show, it urges the Court to reconsider its finding that the

Corporation is a state actor.  The Court is not persuaded.   While the Corporation no

longer directs the Police, it still receives substantial governmental assistance for the Air

Show.  It is also so entangled with the local, state and federal governments that there is an

appearance that the Corporation is acting in concert with them.

While the Corporation claims to have never asked for anything other than the use

of the tarmac for the Air Show, Def. Ex. 190 (Posner Dep.) at 23:2-7,[5] the record clearly

demonstrates that the Air Show could not occur without the simultaneous involvement of

every governmental entity in the area.  The federal government sends military personnel

---

[5]Posner's exact quotation is, "In the entire 17 years that I've been associated with this effort, we have never asked the City of Columbia for anything, other than approval of our 2535's to obtain the tarmac in order to hold the two-day air show."  Def. Ex. 190 (Posner Dep.) at 23:2-7.

9

and multi-million dollar airplanes and equipment. The local governments provide everything from the land for the event to special on-site trash, police, fire and ambulance services. Of primary importance is the fact that the Corporation is putting on an Air Show which cannot occur without the operation of the City's airport. Nor can the Corporation get FAA approval for the Air Show without submitting a ground operation plan which is prepared by the City. In addition, the military will not send its aircraft unless the City attests that it is making the airport available and the event is officially supported by the City.

If the Corporation is not a state actor given these facts, then the state action doctrine can be rendered meaningless by the simple expedient of shifting temporary control of public property to a private corporation while the governmental entity continues to provide essential support for the event. A wink and a nod should not be enough, particularly when the City knows, when it enters into the temporary lease of the tarmac, that the Corporation will exclude all unauthorized speech and will seek the assistance of the City to enforce those rules.

## IV. *Hurley*

The Corporation and the City continue to argue that the First Amendment rights of the Corporation will be violated if the Plaintiffs are permitted to distribute leaflets or carry signs at future Air Shows. They rely primarily on the case of *Hurley v. Irish-*

10

*American Gay, Lesbian and Bisexual Group of Boston*, 515 U S. 557 (1995).[6]  It is now

clear that *Hurley* is inapplicable and the Corporation's First Amendment rights are not

violated by the Plaintiffs' expressive activity at the Air Show.

In *Hurley*, the United Supreme Court held that a private group has a right to

express a certain viewpoint, and as a corollary to that right, can exclude people from its

organization.[7]  For this reason, the state of Massachusetts could not require the private

organizers of a St. Patrick's Day parade to include in their parade the Irish-American

Gay, Lesbian and Bisexual Group of Boston, because the inclusion of that group would

interfere with the message being conveyed by the parade, which is itself a form of

expression.  Similar logic led the Supreme Court in *Boy Scouts of America v. Dale*, 530

U.S. 640 (2000), to find in favor of the Boy Scouts who wanted to exclude homosexuals

from its organization.  According to the Boy Scouts, they had a long history of opposing

homosexuality, so requiring them to admit a homosexual Scout leader would interfere

with their expressive association.

The Plaintiffs, however, are not trying to participate in the Air Show or become

members of the Corporation.  They are not even asking to operate a booth.  They only

want to come into the public area of the event and pass out leaflets, petition, carry signs

---

[6]In *Hurley*, The Supreme Court specifically stated that it was not addressing the question
of whether the parade constituted state action.  Because the Court has found that both the
Corporation and the City are state actors, *Hurley* is irrelevant.  Nonetheless, because Defendants'
primary focus has been on *Hurley*, the Court will explain why it is inapplicable to the Air Show,
even if the Corporation is not a state actor.

[7]The latter is sometimes referred to as "expressive association."

and wear expressive clothing.  Neither *Dale* or *Hurley* are applicable.  See *Gathright v. City of Portland, Oregon*, 439 F.3d 573 (9th Cir. Feb. 24, 2006); *Parks v. City of Columbus*, 395 F.3d 643 (6th Cir. 2005); *Mahoney v. Babbitt*, 105 F.3d 1452, 1456 (D.C. Cir. 1997) (parade organizers could not exclude people watching the parade merely because they carried protest signs).

Further clarification on these issues has been given recently by the United States Supreme Court in *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.,* 126 S. Ct. 1297 (2006).  The Forum for Academic and Institutional Rights ("FAIR") is an association of law schools and law faculties with policies against gender orientation discrimination.  Because the United States military discriminates against homosexuals, members of the Association have not permitted military recruiters to interview their law students at recruitment events sponsored by the law schools.  In response, the United States Congress passed the Solomon Amendment, which requires all universities which receive federal funds to give military recruiters the same access to their students that other employers receive.

FAIR sought a preliminary injunction of the Solomon Amendment, claiming that it violated the First Amendment freedoms of speech and association of its members.  By giving military recruiters equal access, the Solomon Amendment forced the schools to be associated with the discriminatory policies of the military and compelled them to speak a message with which they disagreed.

The Supreme Court rejected FAIR's speech claim primarily because recruitment is

12

not speech or even symbolic speech, it is merely conduct. It also rejected the law schools' argument that the Solomon Amendment required the law schools to accommodate speech with which they disagreed.

The Supreme Court distinguished *Hurley*, saying that a parade is a form of expression and the organizer's message would be affected if it was forced to include someone else's message. In contrast, requiring the law schools to accommodate the military's message, "does not affect the law school's speech, because the schools are not speaking when they host interview and recruiting receptions." *Id.* at 1309. In addition, permitting military recruiters on campus does not suggest that the law schools agree with the message being expressed by the recruiters. The court emphasized that even high school students "can appreciate the differences between speech a school sponsors and speech the school permits because legally required to do so." *Id.* at 1310.

Similarly, the Corporation is not speaking when they stage an Air Show anymore than the law schools are speaking when they host a recruitment fair. An Air Show is conduct, not speech, and there is no evidence in the record that the public could or did perceive the Air Show itself to be a form of expression. In addition, there is no reasonable likelihood that the Plaintiffs will be seen as spokesmen for the Corporation merely because they are present in a public area of the Air Show. If high school students are sophisticated enough to understand the difference between sponsored speech and free speech, the public attending an Air Show can as well.

In *Rumsfeld*, the Supreme Court also rejected the law schools' argument that their

13

freedom to engage in expressive association was violated by the Solomon Amendment.

The Supreme Court said:

> Law schools . . . "associate" with military recruiters in the sense that they interact with them. But recruiters are not part of the law school. Recruiters are, by definition, outsiders who come onto campus for the limited purpose of trying to hire students–not become members of the school's expressive association. This distinction is critical . . . The law schools *say* that allowing military recruiters equal access impairs their own expression by requiring them to associate with the recruiters, but just as saying conduct is undertaken for expressive purposes, cannot make it symbolic speech . . . so too a speaker cannot "erect a shield" against laws requiring access "simply by asserting" that mere association "would impair its message."

*Rumsfeld*, 126 S. Ct. at 1312. Similarly, the Corporation's statement that the Air Show is to honor the military and veterans does not transform the Air Show into symbolic speech. Nor can the Corporation create a protective shield by merely asserting that its message will be impaired by association with the Plaintiffs.

Indeed, in *Rumsfeld*, the Supreme Court reaffirmed its earlier decision in *PruneYard Shopping Center v. Robins*, 447 U.S. 74, 100 S. Ct. 2035 (1980), which is closely analogous to the facts before this Court. In *PruneYard*, the Supreme Court found that the First Amendment rights of a shopping center owner were not infringed by the California Constitution which required the owner to permit solicitations and leafleting on its private property. The shopping center was open to the public, but had a policy that prohibited any expressive activities, including the circulation of petitions. The policy was strictly enforced in a nondiscriminatory manner. Nonetheless, the Supreme Court held that the State of California could require the shopping center to allow students to set up a

14

table and distribute literature opposing a UN resolution against Zionism. The Supreme Court said:

> [T]he shopping center by choice of its owner is not limited to the personal use of appellants. It is instead a business establishment that is open to the public to come and go as they please. The views expressed by members of the public in passing out pamphlets or seeking signatures for a petition thus will not likely be identified with those of the owner. . . . Finally, as far as appears here appellants can expressly disavow any connection with the message by simply posting signs in the area where the speakers or handbillers stand. Such signs, for example, could disclaim any sponsorship of the message and could explain that the persons are communicating their own messages by virtue of state law.

*PruneYard*, 447 U.S. at 87.

Like the owners of the shopping center in *PruneYard*, the Corporation has invited the public onto the tarmac and was required to do so by the military in exchange for its airplanes, personnel and equipment. In this environment, there is no reasonable likelihood that the public will conclude that the Plaintiffs' message reflects the beliefs of the Corporation. As was done in 2005, the Corporation can post signs indicating its disapproval of public expression at the Air Show.[8]

## A        Designated Public Forum or Nonpublic Forum?

The Plaintiffs continue to argue that the Air Show has been designated by the City and the Corporation as a forum to discuss the military and war. Therefore, any First

---

[8]*PruneYard* stands for the proposition that the First Amendment rights of the Corporation are not violated if leafleting, petitioning, or other First Amendment activities occur on the tarmac. An entirely separate issue is whether the Plaintiffs have the right under the United States Constitution to distribute leaflets and to circulate petitions on the tarmac. That issue will be discussed in the next section.

Case 2:05-cv-04061-NKL   Document 100   Filed 03/31/06   Page 15 of 22

Amendment restrictions on the tarmac are subject to strict scrutiny. This argument is reminiscent of the Corporation's position that the Air Show itself expresses support for veterans and current military, and any competing speech violates the Corporation's First Amendment rights.

For purposes of this litigation, both parties would like to make the Air Show something it is not. The Air Show is a fair like event that entertains and educates and provides a good crowd for Memorial Day ceremonies. There is no persuasive evidence that the Corporation or the City intends the Air Show be a place to discuss the military or the war, and there is no evidence that most people come to the Air Show to hear speeches on any topic.[9]

Furthermore, merely because the Corporation speaks when it distributes programs, announces events or conducts the noontime program to honor veterans, does not mean that it intentionally opens the event for public comment on these subjects. Every time a state actor holds a public event and speaks at it does not mean that the state actor is intentionally creating a designated public forum. *See Families Achieving Independence and Respect (FAIR) v. Nebraska Dep't of Social Services*, 111 F.3d 1408, 1418 (8th Cir. 1997) (en banc).

---

[9]Memorial Day parades and ceremonies in Columbia did not historically attract large crowds. Salute to Veterans was organized in the 1980's because Memorial Day festivities then consisted of "[f]ive men gather[ing] at the courthouse for 5 minutes of speeches. If it rain[ed], they [held] it in the garage of the funeral home." Def. Ex. 110. It is, therefore, logical to conclude that many, if not most, of the 25,000 people who attended the 2005 Air Show were attracted to the exhibits and aerobatic displays of aircraft and not the speeches or other expressive activity sponsored by the Corporation at the Air Show.

16

## VI.     What Restrictions are Reasonable?

### A.     Leafleting, but not Petitioning

The Plaintiffs contend that the fair like environment of the Air Show is compatible with petitioning, given the other activities which are permitted on the tarmac and the open spaces that are apparent.  Admittedly, an airport tarmac is not the same as an airport terminal.  Both, however, serve a public that comes for a specific purpose.  In the case of the Air Show, most people come to see aerobatic maneuvers by airplanes.  In that environment, petitioning poses a slight risk that the public's enjoyment will be compromised if it is distracted by petitioners or people soliciting money.  Petitioning requires, at a minimum, substantive communication about the content of a petition, a request for a signature and a refusal.  In contrast, leafletters can be dissuaded with the wave of the hand.

While it is true that the public interacts with many other people on the tarmac during the Air Show, almost all that contact is initiated by the public.  The military recruiters do not go into the crowd and solicit recruits.  Souvenirs, books, food and other commercial items are sold from booths or tables.  It is not unreasonable, under these circumstances, that the Corporation prefers to give the public the right to initiate substantive communication rather than have it thrust on them.  In contrast, leaflets, signs and expressive clothing are so minimally intrusive and can be so easily ignored, that there is little, if any, objective risk that the public will be distracted from viewing the show. For similar reasons, in *Int'l Society for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672,

690 (1992), the United States Supreme Court found that a city could restrict all solicitations in an airport terminal but could not prohibit leafleting even though the terminal was a nonpublic forum.

In support of its argument, Plaintiffs point to the case of *Jews for Jesus, Inc. v. Mass. Bay Transp. Auth.*, 984 F.2d 1319 (1st Cir. 1993), where the First Circuit found that it was unreasonable to restrict petitioning in the Boston subway system. While the First Circuit discusses *Lee* in other contexts, it does not mention the finding in *Lee* that petitioning can be prohibited in an airport terminal. Either the First Circuit failed to follow Supreme Court precedent or, more probably, it found distinguishing facts because the subway system administrators gave no justification for the petitioning restriction and permitted newspaper sales and musicians, which created at least as much congestion as would be created by petitioners. For these reasons, the Court finds the Plaintiffs' argument unpersuasive. The Court is bound by Supreme Court precedent and there is not evidence that activities similar to petitioning are permitted at the Air Show.

The Court recognizes that Operation Simply Shred was allowed to come onto the tarmac and take leaflets from members of the public. Taking leaflets is not materially different from handing out leaflets. While some members of the public were permitted to actually shred their own documents which required somewhat more interaction, it is not the same as petitioning, which requires substantive communication. Given the current record, the Court cannot say that Operation Simply Shred's conduct would justify a finding that petitioning or other forms of solicitation are compatible with the Air Show.

18

While the Plaintiffs object to the Court's limitation on petitioning, the Defendants object to the Court's finding that the Plaintiffs have a right to distribute leaflets at the Air Show. The Defendants cite *New England Regional Council of Carpenters v. Kinton,* 284 F.3d 9 (1st Cir. 2002), and *Hawkins v. City and County of Denver,* 170 F.3d 1281 (10th Cir. 1999), for the proposition that all leafleting can be banned at the Air Show. Both cases are distinguishable. The area in dispute in *Hawkins* was a 600 foot walkway connecting two theaters and a public parking garage. The walkway was between 32 and 40 feet wide and musicians sought to picket during peak traffic flow. The walkway was open all year so problems with traffic control would be difficult to manage.

In *New England Regional Council of Carpenters,* the First Circuit also found that safety considerations justified a complete ban of leaflets at Boston's Fish Pier. The Court emphasized that:

> the fishing fleet generates a great deal of activity; there is a high volume of truck traffic; and there appears to be precious little room in front of the ECC. What space is available serves primarily as a roadway and truck turnaround. In these cramped confines, pedestrian safety and traffic flow are vital concerns. The validity of these concerns is underscored by the fact that, when Massport erected concrete bollards to protect the entrance to the ECC several years ago, the bollards were so severely damaged by trucks executing turnarounds that Massport had to remove them. Thus, although there are few, if any, problems intrinsic to the act of leafleting, safety is a plausible concern here. . . . Given the peculiar setting of the ECC entrance, leafletters run a serious risk of obstructing vehicular traffic and distracting pedestrians as they traverse the roadway.

*New England Regional Council of Carpenters*, 284 F.3d at 25. In contrast, the Air Show is held in a huge, open area on only two days a year and neither Defendants have

presented plausible evidence that leafleting poses a safety risk or would impair traffic.

Finally, merely because there were a few complaints about the Plaintiffs' First Amendment activity on the tarmac, does not justify excluding all leafleting. It is well established in First Amendment jurisprudence that speech which merely offends cannot be prohibited. In a democracy, the solution is more speech not less. This was aptly manifested by Operation Simply Shred.

### B. Signs

The City permitted signs at the 2005 Air Show even though the Court's preliminary injunction order did not require it to do so. Other than a sign being carried at the noontime event to honor veterans, signs did not create any disruption. Given this record, it would be unreasonable to implement a rule that prohibits all signs at future Air Shows. Like leafleting and expressive clothing, signs require no interaction with people observing the Air Show. The City and the Corporation implicitly recognized this when it permitted signs at the 2005 Air Show.

All First Amendment activities on the tarmac, including signs, are subject to reasonable time, place and manner restrictions which are viewpoint and content neutral.

### VII. Noontime Event

No one has objected to the Court's finding that the City and the Corporation can restrict First Amendment activities on the tarmac during the Corporation's noontime event to honor veterans. The City, however, has requested the Court to include "a provision in the permanent injunction to the effect that the police may remove any person

20

from the tarmac engaged in carrying a sign or in leafleting during the memorial who refuses to stop those forms of 'activity and speech' . . . ." City of Columbia's Brief Regarding Issuance of a Permanent Injunction at p. 17. Neither the Corporation nor Plaintiffs have objected to this request. The Court will interpret the City's request as an amendment to its pleadings and will address the issue in this Order.

## VIII. Conclusion

After the 2005 Air Show, the Court had hoped that the parties would mediate their dispute and find an acceptable accommodation for their competing interests. They are in a much better position than the Court to identify creative and nonconfrontational solutions. They have not done so. Accordingly, it is

ORDERED that:

Plaintiffs' Motion for Permanent Injunction and Declaratory Judgment is GRANTED in part and DENIED in part.

1.     Plaintiffs and similarly situated individuals may distribute leaflets at future Memorial Day Air Shows at the Columbia Regional Airport, subject to the permissible restrictions identified in this Order.

2.     Plaintiffs and similarly situated individuals may carry signs at future Memorial Day Air Shows at the Columbia Regional Airport, subject to permissible restrictions identified in this Order.

3.     Plaintiffs and similarly situated people may wear expressive clothing, hats and buttons at future public Air Shows at the Columbia Regional Airport,

Case 2:05-cv-04061-NKL   Document 100   Filed 03/31/06   Page 21 of 22

subject to the permissible restrictions identified in this Order.

4.     The City and the Corporation do not violate the First Amendment rights of the Plaintiffs and similarly situated people when they prohibit petitioning on the airport tarmac during the Air Show, so long as their rules and enforcement practices are content and viewpoint neutral.

The City's Counterclaim for a declaratory judgment is also GRANTED.

1.     The City and the Corporation do not violate the First Amendment rights of the Plaintiffs and similarly situated people when they prohibit First Amendment activities during the noontime event to honor veterans.

2.     The City may remove any person from the tarmac engaged in First Amendment activities during the noontime event to honor veterans.  This includes persons who distribute leaflets or carry signs if the person refuses to stop carrying the sign or distributing leaflets during the noontime event.


                                        s/ Nanette K. Laughrey
                                        NANETTE K. LAUGHREY
                                        United States District Judge

Dated:  March 31, 2006
Jefferson City, Missouri